[L. A. No. 22211. In Bank. Apr. 17, 1953.]

HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, Petitioner, v. CITY OF LOS ANGELES et al., Respondents.

Faries & McDowell, Stanley A. Furman, McIntyre Faries, Leonard S. Janofsky, Herman F. Selvin and Loeb & Loeb for Petitioner.

Ray L. Chesebro, City Attorney, Frank P. Doherty, Special Counsel, William H. Neal, Bourke Jones and John L. Flynn, Assistant City Attorneys, Weldon L. Weber, Deputy City Attorney, Jerome Weber, Henry F. Walker, Bodkin, Breslin & Luddy, Michael G. Luddy, William H. Rosenthal, Nat Rosin, Joseph Ostrow, Garner, Lillie & Bryant, Cameron L. Lillie and H. P. McCarthy for Respondents.

TRAYNOR, J.—The Housing Authority of the City of Los Angeles, by petition filed on August 4, 1952, seeks to have the members of the City Council of the City of Los Angeles held in contempt of this court for their alleged failure to comply with the terms of a peremptory writ of mandate issued

by this court on June 27, 1952. (*Housing Authority* v. *City of Los Angeles*, 38 Cal.2d 853 [243 P.2d 515], certiorari denied, 344 U.S. 836 [73 S.Ct. 46, 97 L.Ed. 41].) That proceeding will be referred to in this opinion as the mandate proceeding.

The mandate proceeding was brought to test the validity of the city's action of December 26, 1951, attempting to abrogate, cancel, and rescind the agreements authorized by Ordinance No. 95,222 adopted on August 8, 1949. By that ordinance the city approved construction of a 10,000-unit low-rent housing project in cooperation with the housing authority of the city and the Public Housing Administration of the United States pursuant to the State Housing Authorities Law and Housing Cooperation Law (Health & Saf. Code, §§ 34200-34368, 34500-34521). The housing authority successfully sought to have this court declare invalid the city's attempted withdrawal of its approval of the project and the attempted cancellation of its agreements, and to compel the city to perform the acts required by the cooperation agreement and other agreements entered into by it with the housing authority for carrying out the contemplated project. We determined that since the city had approved the project, and the housing authority and the Public Housing Administration had made binding contractual commitments and advances in respect to the project, the city was without power, in the absence of express statutory authority, to withdraw its approval or to abrogate its agreements. A writ of mandate issued ''directing the respondents to perform the terms of the agreements entered into with the petitioner and to proceed in the fulfillment of its obligations thereunder.''

In the present proceeding the housing authority alleged various matters as to which it was claimed the city had agreed to take action and as to which it had refused to proceed, in violation of this court's order in the mandate proceeding. An order was issued directing the individual members of the city council to show cause why they should not be adjudged in contempt of this court for failing, neglecting, and refusing to obey the peremptory writ of mandate. By reason of a stipulation of the parties on the return to the order to show cause, the only charge remaining to be considered is the failure of the city to complete annexation proceedings that would include in the site selected for the West Los Angeles (Cal. 4-21) project a county strip entirely surrounded by incorporated territory. The facts relating to the failure

to complete the proceeding to annex the county "island" are undisputed.

On November 22, 1950, the city council approved and adopted a report of its Veterans' Affairs and Housing Committee recommending approval of the authority's proposal to acquire 11 sites including the one now in question. The map of that site, submitted by the authority with its proposal, showed the presence of the county island. Thereafter, an application to the planning commission for a conditional use of the site for a housing project was made. The description of the site recited that it lay "partly in unincorporated territory of the County of Los Angeles," and an attached report pointed out that there should be no difficulty in acquiring title to the county strip and annexing it to the city. On April 26, 1951, the application was granted by the planning commission. An appeal was taken to the city council and denied by that body on June 26, 1951. Thereafter the authority acquired title to the property comprising the county island and requested that the city council annex it. The usual procedure was promptly instituted, and after receiving reports from various city departments, the coordinating board unanimously recommended approval of the proposed annexation. The council referred this recommendation to its planning committee, which reported back on October 24, 1951. It reported that the coordinating board had recommended annexation "as requested by the Los Angeles Housing Authority," and had advised that "the annexation of this strip would conform to the City's policy of absorbing county islands, thereby creating a more regular city boundary line. . . ." The council then adopted its committee's report recommending annexation, and ordered proceedings to that end commenced. Thereafter, however, the city attempted to rescind its cooperation agreement and terminate the development of all public housing projects thereunder.

The city contends not only that it has not contracted to annex territory, but that under the provisions of the Housing Authorities Law (Health & Saf. Code, § 34200 et seq.) and the Housing Cooperation Law (Health & Saf. Code, § 34500 et seq.) it has no power to do so. The city relies on section 34208 of the Health and Safety Code limiting the authority's area of operation to the city and section 34509 permitting the city to cooperate in the planning, construction, and operation of housing projects only when they are

located "within the area in which it is authorized to act." It also points out that there is no express statutory provision authorizing a city to annex territory pursuant to a cooperation agreement with a housing authority.

It may be conceded that under the foregoing provisions the city and the authority do not have power to contract to develop a housing project completely outside the city limits or agree that the city shall annex territory for such a project. In the present case, however, approximately 37 of the 43 acres selected for the site lie in the city. The county territory consists of a strip approximately 150 feet wide by 1,200 feet long that is entirely surrounded by the city and divides the site into two separate and approximately equal parts. It is entirely uninhabited and unimproved. Unless this island, which is an integral part of the site, is annexed, the project cannot be built. Thus the purpose of annexation is not to develop a project outside of the city, but to make possible a project within the city in accordance with the slum-clearance and low-rent housing objectives contemplated by the housing legislation. The questions presented, therefore, are whether the city has contracted or legally can contract to annex such territory as is necessary for the development of a project within its limits.

The authority has the power to "Make and execute contracts and other instruments necessary or convenient to the exercise of its powers" (Health & Saf. Code, § 34311), and the city has authority to "Do any and all things, necessary or convenient, to aid and cooperate in the planning, undertaking, construction, or operation of" a housing project. (Health & Saf. Code, § 34516.) Pursuant to this provision the city agreed "to cooperate with the Authority . . . by such other lawful action or ways as the Authority may find necessary in connection with the development and construction of the Projects." Before this controversy arose, these provisions of the housing acts were consistently interpreted by those charged with their administration and interpretation as authorizing the necessary annexation proceedings under the quoted contract provision.

The consistent course of conduct followed by the city before it attempted to abrogate the entire housing program makes clear that it agreed to annex the county island as a necessary step in the development of a project located in the city. (*Woodbine* v. *Van Horn*, 29 Cal.2d 95, 104 [173 P.2d 17]; *Davenport* v. *Davenport Foundation*, 36 Cal.2d 67, 73-74

[222 P.2d 11].) That course of conduct, however, amounted to more than a practical construction of the contract between the parties; it also constituted an interpretation of the statutes upon which the contract was based. ■ " '[T]he contemporaneous administrative construction of the enactment by those charged with its enforcement and interpretation is entitled to great weight, and courts generally will not depart from such interpretation unless it is clearly erroneous or unauthorized.' (*Coca-Cola Co.* v. *State Board of Equalization,* 25 Cal.2d 918, 921 [156 P.2d 1] . . . .)" (*Richfield Oil Corp.* v. *Crawford,* 39 Cal.2d 729, 736 [249 P.2d 600].)

■ We have concluded that the interpretation heretofore placed upon the statutes and contract by the parties is correct. The authority is not attempting to expand its territorial jurisdiction by developing a project outside of the city. It is seeking only to effectuate its purposes within the city. As pointed out by the city planning department, "Annexation, as proposed, would permit the consolidation of the housing program entirely within the limits of the City of Los Angeles, absorb an island which is presently located within the County of Los Angeles, surrounded entirely by the City limits of Los Angeles, and permit the construction of the necessary sewers to serve the residences within the proposed housing development which cannot be constructed if the narrow strip of County land is not annexed to the City of Los Angeles. . . ."

■ It is now settled that the city has no right to abrogate the contract here involved or to withdraw its approval of the development and construction of these projects. "[H]aving taken the initial discretionary action to bring the housing authority into operation and having approved a project and entered into a cooperation agreement, there was nothing left to be done by either contracting party but to perform administratively whatever was necessary to carry the agreement into effect. . . . [T]he law enjoins upon the city the duty to perform the terms of its agreements entered into with the housing authority and to go forward with the exercise of the powers which it has agreed to undertake in cooperating with that authority." (*Housing Authority* v. *City of Los Angeles,* 38 Cal.2d 853, 862, 871 [243 P.2d 515].)

There is nothing in the statutes governing the territorial jurisdiction of the city and the authority that permits the city to evade its duty *pro tanto* by departing from

its established policy of annexing unincorporated islands. The authority selected, and the city council approved, a site selected in the city. To develop a project on that site it is admittedly necessary that the county island be annexed. Both the city and the authority have power to do what is necessary to develop projects in the city, and the city has contracted to exercise such power when requested by the authority to do so.

Since the question of annexation was not specifically presented in the mandate proceeding, we are of the opinion that respondents should not be fined for contempt. Petitioner seeks no more at this time than to have respondents ordered to complete annexation of the county island. We may make such an order under section 1097 of the Code of Civil Procedure.

Respondents are ordered to comply with the writ of mandate heretofore issued by annexing the territory in question.

Gibson, C. J., and Spence, J., concurred.

CARTER, J.—I concur in the reasoning and the conclusion in the opinion prepared by Mr. Justice Traynor that the action of the City Council of the City of Los Angeles in refusing to annex the strip of land (county island) embraced within the West Los Angeles Housing Authority Project constituted a violation of the agreement between the authority and the city which the city was directed to perform by the writ of mandate issued by this court in *Housing Authority* v. *City of Los Angeles,* 38 Cal.2d 853 [243 P.2d 515], but I do not agree that no punishment should be imposed for the refusal of the city to obey said writ.

While I think there is no question that the contract between the city and the authority clearly contemplated the annexation of land which might be considered necessary for the contemplated project, it is clear that under the factual situation disclosed by the agreed statement of facts in this proceeding, the city is estopped to deny annexation of the area here involved by its conduct which induced the authority to believe that the annexation proceeding would be consummated and the authority was therefore justified in acquiring the area.

There can be no question that the city has the power to annex the area in question under the Annexation of Uninhabited Territory Act of 1939 (Gov. Code, § 35300 et seq.).

It is authorized to exercise that power in aid of the development of a housing project as the Housing Cooperation Law expressly provides that the city may "do any and all things, necessary or convenient, to aid and cooperate in the planning, undertaking, construction or operation of" a housing project. (Health & Saf. Code, § 34516.) It is clear from the record before us that the plan and design of the present housing project contemplated the annexation of this small parcel of land which was entirely surrounded by territory within the boundaries of the city of Los Angeles, and there can be no doubt that the city council had knowledge that the West Los Angeles site included the county island and that annexation of that island was contemplated. With this knowledge the city approved acquisition and use of the site for a housing project. In reliance on this approval the authority acquired the property. The city council on November 22, 1950, approved the proposal to acquire the site and the request of the housing authority relating thereto.

The council's approval, however, was more than approval of the acquisition of the site, it was also an express concurrence in the authority's plan to use the site for a housing project. But the matter did not rest there. After the authority had proceeded with its design for the project to the point where the number and ground locations of the proposed project had been determined, it applied to the city planning commission for a conditional use of the site for a housing project. That application described the site as *"lying partly in unincorporated territory of the County of Los Angeles."* It was also accompanied by maps and other data clearly showing the existence of this county island in the middle of the site, and the contemplated location on it of some of the buildings. It was also accompanied by a copy of the authority's "Development Program" which embraced a narrative description of the proposed project. In it appeared the following statement: "It (the proposed site) is situated around a small slum area in the county owned by four private individuals. There should not be any difficulty in acquiring the county strip and annexing it to the City."

There can be no doubt that the planning commission was fully aware of this situation and of the necessity for annexation. It must, of course, be assumed that the commission was familiar with the record upon which it acted. In addition, in the planning department's report approving and recommending this annexation, it is said with reference to the

commission's previous acts, that the planning commission had "approved the site for a housing project, which included the property under consideration (the county island)." Furthermore the sites selected by the authority were reported to the city planning department, and on June 26, 1950, the director of planning reported on the compatability of the West Los Angeles site with the city's zoning plan. With that knowledge the planning commission approved the authority's application on April 26, 1951. On June 26, 1951, the city council having before it all the data and exhibits which were before the planning commission, concurred in the latter's grant of a conditional use of the West Los Angeles site for a housing project. In its resolution of concurrence the council recited that this site was "fully described in the application for a conditional use." The description referred to the site as "lying partly in unincorporated territory of the County of Los Angeles." This action of the city clearly indicated its approval of a housing project on the proposed West Los Angeles site. Such action was taken with full knowledge of, and without objection or exception to, the fact that a small part of the proposed site lay outside of the city, and it was taken after the planning commission and the council had been told that acquisition of the property and its annexation were contemplated. In these circumstances there was ample justification for the authority's belief that whatever was necessary and could be lawfully done to bring this county island into the city and, therefore, make it usable as part of the whole project, would be done. It was not until this action had been taken that the authority bound itself to the acquisition of title to the county island.

It is clear that all of the elements of estoppel are present—with knowledge of the facts the officials of the city approved acquisition of the site and its use for public housing, upon which actions the authority relied in acquiring the property. Knowing that annexation was necessary to enable the authority to use the site thus acquired for the housing project, may it not be said that a legal duty was imposed upon the city officials to consummate the annexation proceeding? Admittedly there is no legal barrier against such action—the city council has the power to annex the area. Then why should the doctrine of estoppel not apply in such a case?

It has been said generally that a governmental agency may not be estopped by the conduct of its officers or employees (10 Cal.Jur. 650-651), but there are many instances in which

an equitable estoppel in fact will run against the government where justice and right require it. (*Farrell* v. *County of Placer,* 23 Cal.2d 624 [145 P.2d 570, 153 A.L.R. 323]; *City of Los Angeles* v. *Cohn,* 101 Cal. 373 [35 P. 1002]; *Fresno* v. *Fresno C. & I. Co.,* 98 Cal. 179 [32 P. 943]; *Sacramento* v. *Clunie,* 120 Cal. 29 [52 P. 44]; *Brown* v. *Town of Sebastopol,* 153 Cal. 704 [96 P. 363, 19 L.R.A.N.S. 178]; *Times-Mirror Co.* v. *Superior Court,* 3 Cal.2d 309 [44 P.2d 547]; *Sutro* v. *Pettit,* 74 Cal. 332 [16 P. 7, 5 Am.St.Rep. 442]; *City of Los Angeles* v. *County of Los Angeles,* 9 Cal.2d 624 [72 P.2d 138, 113 A.L.R. 370]; *Contra Costa Water Co.* v. *Breed,* 139 Cal. 432 [73 P. 189]; *County of Los Angeles* v. *Cline,* 185 Cal. 299 [197 P. 67]; *La Societe Francaise* v. *California Emp. Com.,* 56 Cal.App.2d 534 [133 P.2d 47]; *McGee* v. *City of Los Angeles,* 6 Cal.2d 390 [57 P.2d 925]; *Ernst* v. *Tiel,* 51 Cal. App. 747 [197 P. 809]; *People* v. *Gustafson,* 53 Cal.App.2d 230 [127 P.2d 627]; *Hewel* v. *Hogin,* 3 Cal.App. 248 [84 P. 1002].) A few instances may be pointed out in which the justice of invoking estoppel is present as much or even less than here. In *Times-Mirror Co.,* v. *Superior Court,* 3 Cal.2d 309 [44 P.2d 547], the city of Los Angeles was held estopped to abandon eminent domain proceedings where, in reliance thereon, defendant property owner had acquired other property and constructed a building thereon. It was there said (p. 330), "If the city had expressly agreed by its officers with defendants' grantors, even in parol, that a certain line should constitute the boundary line between the street and the grantor's property, and upon the faith of such agreement the grantors had erected a block of buildings flush with the line of the street as agreed upon by all parties, it would be a hard law that would allow the city to repudiate that agreement, and destroy the grantor's property. No court should countenance such a thing, and an estoppel *in pais* will rise up in the pathway of a city to bar it and its principal, the people, from the commission of such a grievous wrong; and to give the acts of this city a very limited meaning we think its conduct in the present case at least equivalent to an oral agreement as to the location of the true boundary line of the street." (To the same effect, see *McGee* v. *City of Los Angeles,* 6 Cal.2d 390 [57 P.2d 925].) In *City of Los Angeles* v. *Cohn,* 101 Cal. 373 [35 P. 1002], the city was estopped to claim property which it owned but said it did not and in reliance thereon the person who had been in possession thereof built a building on it. The same situation, except it was a canal

through a city, was involved in *Fresno* v. *Fresno C. & I. Co.,* 98 Cal. 179 [32 P. 943]. Land claimed by the city as streets was considered in *Sacramento* v. *Clunie,* 120 Cal. 29 [52 P. 44]. In *City of Los Angeles* v. *County of Los Angeles,* 9 Cal. 2d 624 [72 P.2d 138, 113 A.L.R. 370], a county was held estopped to collect from a railroad company additional payments for use of its land when it had been accepting certain payments for 15 years. In *Contra Costa Water Co.* v. *Breed,* 139 Cal. 432 [73 P. 189], the city was held liable for water it received and was estopped to deny liability on the claim that its ordinance providing for payment was invalid. In *Tyra* v. *Board of Police Etc. Commrs.* 32 Cal.2d 666 [197 P.2d 710], it was held that the city was estopped to plead the statute of limitation in an action by an employee for a pension where the pension commissioners had erroneously told him he could not receive a pension while he was receiving workmen's compensation. *Baird* v. *City of Fresno,* 97 Cal.App.2d 336 [217 P.2d 681], is particularly applicable. It was there held that the city was estopped, when a pension was claimed, to rely on the invalidity of its determination made many years before that its employee should be credited with nine years of service with the city. Mention is made in some of these cases that where there is general power authorizing action by a governmental body in a particular field, the government may be estopped to assert irregularity in the exercise of that power. None of the foregoing authorities presents a clearer case for estoppel than the case at bar.

I desire particularly to call attention to the very pertinent language used by Mr. Justice Shenk in speaking for this court in *Housing Authority* v. *City of Los Angeles,* 38 Cal.2d 853 at pages 869 and 870 [243 P.2d 515] : "In *Times-Mirror Co.* v. *Superior Court,* 3 Cal.2d 309 [44 P.2d 547], the city of Los Angeles attempted to withdraw from and abandon condemnation proceedings to acquire land and properties of the Times-Mirror Company for use in a contemplated civic center. In the meantime the Times-Mirror had constructed a building on another location. The writ of mandamus issued in effect to prevent abandonment by the city of the pending condemnation proceedings by directing the respondent court to proceed with the trial of the condemnation action. The issuance of the writ was indicated by the application even as against the public body of the equitable doctrine of estoppel. This court, citing *City of Los Angeles* v. *Cohn,* 101 Cal. 373, observed (at p. 330 [35 P. 1002]) that there are limits beyond which even a

city in representing the rights of the public might not go. That and the Cohn case constitute authority that the court is not bound by precedent in determining what facts and circumstances compel the issuance of the writ but that the writ will issue as against a city or other public body or officer wherever law and justice require such action. The present matter involves more than equity and justice. As has been noted the statutory provisions impose the duty upon the city to perform the administrative acts contemplated by the state legislative action in a matter of state concern. The policy of that law is not a matter of judicial concern or control. Both the Congress of the United States and the Legislature of this state have provided for the cooperative effort evidenced by the contracts between the city and the housing authority. Each of these entities as governmental agencies of the state was authorized to enter into the contracts here sought to be enforced as a public duty on the part of the city.'' The foregoing is particularly applicable here as it correctly applied the doctrine of estoppel rule of the Times-Mirror Company and Cohn cases to the factual situation then before this court which is identical with that disclosed by the record now before us.

The record in this case presents a sordid picture of political intrigue and chicanery and resort to fine-spun legal theories on the part of a majority of the city council of the city of Los Angeles to abrogate its contract with the housing authority and thus obstruct, delay and defeat the housing project contemplated by said contract. A narration of the official acts contained in the ''Stipulation of Facts re Contempt'' and the briefs of counsel should demonstrate to any unprejudiced mind that after December 4, 1951, a majority of the city counsel undertook to wreck and destroy the housing project here involved. The following appears without contradiction: On September 14, 1951—only two days after the authority had acquired title to all of the county island, and, therefore, as soon as it could do so without affecting the interests of private owners in the area—the authority requested the council to annex this county island pursuant to the Annexation of Uninhabited Territory Act of 1939. That request expressly directed attention to and quoted the provisions of paragraph 7 of the cooperation agreement relating to the city's promise to cooperate with the authority by ''such other lawful action or ways as the Authority may find necessary in connection with the development and construction of

the Project''; stated that this county strip should be annexed to the city; and requested that the necessary proceedings be taken to accomplish that result.

Promptly upon receipt of this request the council began the processing procedure customarily followed in such matters. The first step was to refer the matter to the Coordinating Board of the City of Los Angeles, composed of representatives of various of the city's departments and of which the city director of planning is chairman. That board received reports on the annexation question from: the street widening and opening division of the department of public works; the board of public utilities and transportation; the health department; the planning department; and the department of water and power. Each of these departments approved and recommended annexation, several of them pointing out that annexation of county islands was in keeping with the city's policy of absorbing them and creating regular boundary lines. Accordingly, on October 11, 1951—less than a month after the authority's request—the coordinating board made its report to the council unanimously recommending and approving the proposed annexation.

The council referred this report to its planning committee. That committee reported back on October 24, 1951. The committee's report stated that the coordinating board had recommended annexation ''as requested by the Los Angeles Housing Authority''; and had advised ''that the annexation of this strip would conform to the City's policy of absorbing county islands, thereby creating a more regular city boundary line. . . .'' Approval of the proposed annexation was, therefore, recommended in accordance with the coordinating board's recommendation. On November 14, 1951, the council adopted the committee report and ordered preparation of a resolution of intention under the Annexation of Uninhabited Territory Act of 1939.

Between November 14 and November 29, 1951, the city attorney prepared the resolution of intention and transmitted it to the planning department. That department approved the resolution on November 29, 1951. On December 4, 1951, the city attorney transmitted it to the council and the council referred it to its planning committee. There it rested until after the rendition of this court's original decision in the instant cause.

On July 21, 1952, the planning committee reported the resolution out to the council, but a motion to adopt it failed. On

the following day that action was reconsidered and the matter postponed to August 1, 1952. The council, however, failed to meet on the latter day for want of quorum. On August 4, 1952, another motion to adopt the resolution of intention failed. This action was also reconsidered on the next day and the matter postponed to August 15, 1952. On that day the council amended the proposed draft so as to recite that the reason for the annexation was the compulsion of this court's mandate and the desire of the council to comply "in the event it should be judicially determined that compliance therewith requires annexation of this territory." The resolution was further amended by changing the date of public hearing from September 4 to September 19, 1952.

The public hearing called for by the resolution of intention was held on September 19, 1952. No protests, oral or written, against the proposed annexation had been or were received. The council then ordered preparation of an ordinance approving annexation. That was done and the ordinance was introduced for adoption on September 25, 1952. Unanimous consent to act on it that day was requested and refused, respondent Harby objecting. The ordinance was, therefore, laid over one week. Then ensued a series of attempts to procure adoption of the ordinance. All of them failed, the only action which the council would take being further postponement to November 10, 1952. In the meantime the application for a writ of certiorari had been denied on October 13, 1952, so there was no longer any basis for delay on the ground of the pendency of that proceeding.

This refusal to annex a small, contiguous uninhabited county island, annexation of which had been recommended and approved by all city departments concerned, and to which there is no public protest, is unprecedented in the history of the city. Not one request for such an annexation—and there have been some 34 of them from private owners and from governmental agencies—has been refused since enactment of the Annexation of Uninhabited Territory Act of 1939. The city's policy was always to annex and absorb such islands in order to create more regular city boundaries.

The decision of this court ordering the issuance of a peremptory writ of mandate was filed on April 28, 1952, and the writ was issued on June 27, 1952, after one stay had been granted and another refused by this court and by a Justice of the United States Supreme Court. Decision of the cause

brought no immediate change in the respondents' attitude, notwithstanding that at the hearing on the mandate petition the court was told by the city attorney that all that was needed or wanted by respondents was a determination of the basic question of the city's duty to proceed with performance of the cooperation agreement. The same attitude of defiance and refusal to act which compelled the authority to apply for mandate in the first instance persisted even after that determination had been made. As a result, no substantial action in aid of the projects was taken, although there were then pending previously filed requests for cooperation by way of street closing, inspection and review of plans and specifications, conveyance of tax-deeded lands, and annexation of the West Los Angeles county island.

This attitude on the part of the city council was not merely the result of holding matters in suspense pending action on the application to the United States Supreme Court for a writ of certiorari. It was rather an attitude prompted by a refusal to accede to and comply with the writ of mandate. That is best shown by a resolution, adopted by the council on June 25, 1952 (one month after this court's decision had become final and two days after a further stay had been refused) in which it was said:

". . . this Council action constitutes notice to all persons and parties, including the Mayor; the City Housing Authority, its officers and agents, that this Council will resist any efforts at furtherance of the public housing program. . . ."

It is further shown by the continuous efforts of respondents to effect abandonment of that program, notwithstanding the judgment of this court. Thus, the council persisted in holding an election on that question, even though on several occasions the city attorney informed this court that decision of the basic question would settle that issue too. Again, on May 7, June 19 and June 20, 1952, the council formally requested the state Legislature and the Congress to enact legislation permitting abandonment or cancellation of the program.

It is interesting and significant to contrast the expeditious way in which this matter was handled before December 4, 1951, with the tortuous, delaying actions of the respondents after that time. Of course, before December 4, 1951, respondents were cooperating in good faith in the common objective of developing and constructing these projects. After that time, and notwithstanding this court's mandate, they

were doing their best to prevent accomplishment of that objective.

It has been aptly said: "If we say with Mr. Justice Holmes, 'Men must turn square corners when they deal with the Government,' it is hard to see why the government should not be held to a like standard of rectangular rectitude when dealing with its citizens." (48 Harv.L.Rev. 1299.)

Frankly, I am not impressed with the contention of any of the respondents that their refusal to cooperate with the authority by consummating the annexation proceeding was motivated by a conscientious desire to perform his official duty. The duty to cooperate cannot be distorted into a power to frustrate. The mandate issued by this court was clear and unambiguous. Any person who honestly desired to comply with it would have cooperated in consummating the annexation proceeding and thus enable the housing authority to complete its project. I cannot, therefore, see any justification for the tortuous, delaying, and frustrating actions of respondents as disclosed by the record before us.

It is my opinion, therefore, that those respondents who have refused to cooperate in consummating the annexation proceeding here involved, have wilfully violated the mandate of this court issued on June 27, 1952, in the original mandamus proceeding, and that an appropriate fine should be imposed upon each of them for this violation.

SHENK, J.—I dissent.

It is a fundamental principle of law that a municipality may not contract away its legislative functions without authority from a competent superior power. Here the Legislature has authorized a municipality in this state to surrender certain legislative discretion with reference to public housing to the will of a housing authority of that city. This may be done on certain conditions which are: that the housing authority be first created by the city; and secondly, that a contract of cooperation be entered into between the housing authority and the city with reference to public housing. Those conditions have long since been met in this case; and it has been established by prior decisions of this court that the city has thereby surrendered its legislative discretion to the city housing authority in matters concerning which it is competent for the housing authority to proceed, and that it is the duty of the city to cooperate with the housing authority concerning such matters.

But it is not the law and it cannot rightly be held that the city may be compelled to cooperate with the housing authority in matters concerning which it is beyond the power of the housing authority to undertake. That is what the majority opinion is directing the city to do. The city housing authority has no jurisdiction to conduct housing operations outside of the limits of the city, whether the territory be large or small. The jurisdiction in that territory, under the statute, is within the exclusive jurisdiction of the existing county housing authority. That authority is not a party to this proceeding and its jurisdiction over the territory sought to be annexed cannot, under these circumstances, be taken away by the conduct of the city or of the city housing authority on any theory. Estoppel does not reach it. That theory is a false quantity in this case. It is an equitable doctrine available only to a party who is in a position to rely upon and assert it. It cannot be employed in this case as a means to confer jurisdiction on the city housing authority to operate in county territory; a power which is denied to it by the statute and is therefore wholly lacking.

What the majority is here doing is to compel the city to surrender its legislative power to decide whether or not to annex county territory (a conceded legislative power) to the discretion of the city housing authority in a matter over which that housing authority has no jurisdiction. This it should not be required to do. The cooperation of the city in this particular matter should come only from the voluntary action of the city in the exercise of its still retained and unsurrendered legislative discretion and power to annex contiguous unincorporated territory.

The question presented in this case is of great importance in the conduct of public housing operations in this state and I am disposed to elaborate rather fully on my views concerning it.

As indicated in the majority opinion this is a proceeding to have it adjudged that the members of the City Council of the City of Los Angeles are in contempt for their alleged failure to comply with the provisions of a peremptory writ of mandate issued by this court on June 27, 1952. The history of the controversy is contained in the opinion filed April 28, 1952 (38 Cal.2d 853 [243 P.2d 515]; certiorari denied Oct. 13, 1952, 344 U.S. 836 [73 S.Ct. 46, 97 L.Ed. 41]). The proceeding in which that opinion was filed and the per-

emptory writ was issued will be referred to as the mandate proceeding.

The purpose of the mandate proceeding was to test the validity of the city's action of December 26, 1951, attempting to abrogate, cancel and rescind the agreements authorized by Ordinance No. 95,222 adopted on August 8, 1949. That ordinance indicated the approval by the city of the construction of a 10,000-unit low-rent housing project in cooperation with the housing authority of the city and the Public Housing Administration of the United States pursuant to the State Housing Authorities Law and Housing Cooperation Law (Health & Saf. Code, §§ 34200 et seq. and 34500 et seq.). In that proceeding the housing authority successfully sought to have this court declare invalid the attempted withdrawal of the city's approval of the project and the attempted cancellation of agreements, and to compel the city to perform the acts required by the cooperation and other agreements entered into by it with the housing authority for carrying out the contemplated project.

In the mandate proceeding this court determined that since the city had approved the project, and the housing authority and the Public Housing Administration had made binding contractual commitments and advances in respect to the project the city was without power, in the absence of express statutory authority, to withdraw its approval or to abrogate its agreements, but was under the statutory duty to perform them. In summarizing the duty enjoined by the statute upon the city it was said (38 Cal.2d at p. 871): "It is concluded that the law enjoins upon the city the duty to perform the terms of the agreements entered into with the housing authority and to go forward with the exercise of the powers which it has agreed to undertake in cooperating with that authority. On this record a direction that the city so proceed will afford the relief expedient to accomplish the purpose of the proceeding. It is of no concern that the mandate does not issue directing the specific powers to be exercised—since in many respects the details thereof are subject to the discretionary cooperative action of the city. The city does not contend that it will not go forward with the performance of the contracts if under the law it had no right or power to rescind the approval of the project or to cancel and abrogate the agreements." Thereupon the order of the court required the issuance of a writ of mandate "directing the respondents to perform the terms of the agree-

ments entered into with the petitioner and to proceed in the fulfillment of its obligations thereunder.''

In the present proceeding the housing authority alleged various particulars as to which it was claimed the city had agreed to take action and as to which it had failed and refused to proceed, all in violation of this court's order in the mandate proceeding. An order was issued directing the individual members of the city council to show cause why they should not be adjudged in contempt of this court for failing, neglecting and refusing to obey the peremptory writ of mandate issued on June 27, 1952, wherein they were ordered and commanded to perform the terms of the agreements entered into with the housing authority and to proceed in the fulfillment of their obligations thereunder.

It is at once apparent that the basis for any charge and finding of contempt herein must be the failure and refusal of the city to perform an act which under the statute it may lawfully agree to perform and which by agreement it has bound itself to perform in the cooperative undertaking. On the return to the order to show cause it was stipulated that the city had completed performance of a separate written agreement to acquire and convey to the housing authority tax-deeded lands within the 11 sites selected for the construction of the project; and had vacated and closed streets and alleys in those areas as provided in the cooperation agreement. The only charge remaining to be considered on the return is the alleged failure of the city to complete annexation proceedings for the purpose of including in the site selected for the West Los Angeles (Cal. 4-21) project a county strip entirely surrounded by incorporated territory—a so-called unincorporated or county ''island.'' As alleged good cause why it should not be compelled to complete the annexation proceeding the city council contends that the authority has no power to proceed in respect to unincorporated territory; that the statute does not authorize, nor has the city entered into an agreement for the annexation of unincorporated territory, and that the acts of the city council with reference to the annexation thereof commenced heretofore may not be held to estop the city from denying such authorization or agreement.

The facts relating to the alleged failure to complete the proceeding to annex the county ''island'' in the West Los Angeles (Cal. 4-21) project, are stipulated. The record shows the following undisputed facts:

As noted, Ordinance No. 95,222 approving the 10,000-unit low-rent housing project was adopted on August 8, 1949. Prior to that time, and from 1938, there existed and there still exists both a Housing Authority of the City of Los Angeles and a Housing Authority of the County of Los Angeles. In the cooperation agreement approved by the ordinance, the Housing Authority of the City of Los Angeles agreed to undertake, develop and administer the low rent housing project on sites to be selected by the authority in the city of Los Angeles. The city agreed to cooperate with the authority by vacating streets, by accepting dedication of land for new streets, by zoning or rezoning areas to appropriate classifications, and "by such other lawful action or ways as the Authority may find necessary in connection with the development and construction of the Projects."

On August 17, 1950, the housing authority advised the city council concerning the sites that had been selected, with tentative names of each site including the West Los Angeles area, (Project Cal. 4-21). Project site maps accompanied the letter, but the map of the West Los Angeles area did not designate the strip in controversy as county territory. On November 16, 1950, in a letter to the Veterans' Affairs and Housing Committee the housing authority requested that its proposal to acquire the land indicated in the selected sites be approved by the city council. The map of Cal.4-21 project accompanying this letter showed the 43-acre project bisected by a strip of unincorporated territory comprising about six acres, or as stipulated a strip approximately 150 feet wide by 1,200 feet long.

On November 22, 1950, the city council approved and adopted a report of its Veterans' Affairs and Housing Committee concerning the 11 proposed sites. The report recommended approval of the authority's proposal to acquire the sites conditioned on the awareness that cooperative action affecting construction, planning, zoning, and the opening and closing of streets would be involved. In April, 1951, when the authority was in the process of acquiring land in the site, it applied to the city planning commission for conditional use permits. For the first time a surveyor's legal description of the West Los Angeles site boundaries expressly delineated the project as lying partly in unincorporated territory of the county and partly within the city. The accompanying architectural plans showed 62 residential buildings, four of which

were to be wholly located in the unincorporated strip and six partly so. A copy of the housing authority's development program for that project for submission to the United States Public Housing Administration also accompanied the application. In that program it was stated by the housing authority that the proposed West Los Angeles site was situated around a small county slum area in a strip containing four parcels which should not be difficult to acquire and annex to the city. On June 26, 1951, the planning commission granted the application for the conditional use permit. In subsequent private negotiations consummated on September 12, 1951, the authority acquired the title to the four parcels and now holds the strip as uninhabited county territory.

On September 14, 1951, the authority requested the city council to take proceedings on its own motion to annex the county strip. In doing so the authority expressly invoked the language of the cooperation agreement whereby the city agreed to cooperate with the authority ''by such other lawful action or ways as the Authority may find necessary in connection with the development and construction of the project.'' On September 20th, the council referred the request to the city coordinating board, which in turn received reports from various city departments. The coordinating board reported back to the council on October 11, 1951, recommending annexation of the county strip. The council on October 24, 1951, referred the authority's request to its planning committee, which on the same day reported back to the council. On November 8, 1951, the boundary commissioin of the county approved a description of the county strip. On November 14th the council adopted the planning committee report which recommended (1) annexation as conformable to the city's policy of absorbing ''county islands'' to create a more regular city boundary line; and (2) that the city attorney be instructed to present the necessary resolution of intention pursuant to the Annexation of Uninhabited Territory Act of 1939. The city attorney prepared the draft of a resolution which was presented to the city planning commission and approved by it on November 29, 1951. On December 4th, the city attorney transmitted the draft to the city council which in turn referred it to its planning committee.

As shown in the opinion filed in the mandate proceeding, the city council attempted to withdraw the approval of and to abrogate the various agreements relating to, the housing

projects covered by Ordinance 95,222; and the question of the city's power to do so was litigated to the ultimate determination indicated. Thereupon, on July 21, 1952, at the request of the city council, the resolution of intention in the annexation proceeding was reported out of the council's planning committee and its adoption moved. The motion failed of passage. On July 22d, the council voted to reconsider its action. A motion to postpone action to August 1, 1952, was adopted by a majority vote of eight. On August 1st, there was no quorum. On August 4th, with a quorum present, a motion to approve the resolution failed of passage. On August 5th, the council again reconsidered its action and a motion to postpone to August 15th was adopted by the vote of eight councilmen. On August 15th the council, with a full membership present, amended the resolution to include a change in the hearing date and unanimously adopted it as amended. A public hearing was held on September 19, 1952. No one protested the matter and the city attorney was directed to prepare an ordinance approving the annexation. On September 25, 1952, the ordinance was introduced for adoption. The required vote failed. On October 2d, a motion for adoption again failed of passage. A motion carried to continue consideration to October 16, 1952. On the latter date, by the vote of eight councilmen, a motion was adopted to continue the matter to October 20th. There was no quorum on October 20th, and on October 21st the matter by the same vote was continued to November 10th.

On November 6, 1952, the city made its return to the order to show cause in this contempt proceeding. The issues are submitted on the return, the record including the stipulated facts, and the arguments and briefs of the parties.

The contention that neither the authority nor the city had any extraterritorial power and that the city housing authority may not operate in county territory is unquestionably correct. In fact, the parties concede that the city housing authority may not develop any portion of the project construction program in county territory in the circumstances of the present case.

Both the authority and the city, in relation to low-rent housing project developments, are governed by the Housing Authorities Law and the Housing Cooperation Law. Under the statutes they are operating as arms of the state in a matter of state-wide concern. This status and the controlling effect of the statutes were settled by this court's decision in the

mandate proceeding. There it was said (38 Cal.2d at p. 862) : "Each functioning body, the city and the housing authority, is a separate body politic vested with specific duties and powers under the Housing Authorities Law and Housing Cooperation Law to effect a state objective. Neither is functioning independently of that state law. In pursuing the state objective each is governed by the state law and neither may exercise powers not vested or recognized by that law. The city and the housing authority function as administrative arms of the state in pursuing the state concern and effecting the legislative objective. . . . Upon the formation of the housing authority the state law thereupon and thereafter controlled the city and the housing authority and no other law concerning the acquisition, operation or disposition of property is applicable to the authority except as specifically provided. (Health & Saf. Code, § 34320.) . . . [The city] having approved a project and entered into a cooperation agreement, there was nothing left to be done by either contracting party but to perform administratively whatever was necessary to carry the agreement into effect. (*Kleiber* v. *City & County of San Francisco, supra,* 18 Cal.2d 718, 724 [117 P.2d 657] ; *Housing Authority* v. *Superior Court, supra,* 35 Cal.2d 550, 558 [219 P.2d 457].) ''

True, as the text continues, the city may not refuse to cooperate in the ways that the statute and the agreements require. But this is not to say that either the statute or the cooperation agreement requires the city to cooperate with reference to an operation by the city housing authority in territory outside of the city which the authority had no power to initiate.

Section 34208 of the Health and Safety Code defines the "area of operation" of a city authority and a county authority. That section provides that the "area of operation" of a city authority does not include any area which lies within the unincorporated area of any county for which an authority has been authorized to transact business. At all times here involved the Los Ángeles County Housing Authority has been and is in existence and authorized to transact business. By section 34209, the "area of operation" by a county authority includes all of the county except the area within the territorial boundaries of any city for which an authority has been authorized to transact business. In the absence of a county authority, the "area of operation" of a city housing authority includes the city and the area within five miles of its territorial bound-

aries. Thus it may be assumed that if there were no county authority annexation would be unnecessary to give jurisdiction to the city housing authority to initiate operations in the county strip in question.

It must be clearly apparent that the powers given in the matter of cooperation relate, as specified in section 34509 of the Health and Safety Code, to "housing projects located within the area" in which the public body is authorized to act under the statute. As bearing on the city's duty to annex territory the housing authority relies on section 34514. That section provides that any city "may change its map." But since there is neither power nor requirement that the housing authority operate outside the territorial confines of the city but in fact is prohibited from doing so, the provision does not imply a duty to annex territory as cooperation on the part of the city.

It was made clear in the opinion filed in the mandate proceeding that the city may agree to conduct authorized proceedings involving the legislative function, such as for the opening and closing of streets within the city, which may be necessary or desirable in the completion of a project, and that such authorized proceeding, pursuant to agreement come within the category of the administrative acts indicated by the statute as desirable in the consummation of the state objective. (See Op., 38 Cal.2d at p. 868.)

The housing authority contends that the city has made an agreement to annex such county territory as the authority finds necessary for inclusion in the city housing project. The authority points to the quoted language of the cooperation agreement whereby the city agreed to cooperate "by such other lawful action or ways as the Authority may find necessary in connection with the development and construction of the project." This provision in the agreement refers to matters as to which the authority may lawfully make the decision of desirability or necessity. Here the matter of including county territory in a city housing project is in the first instance a question for submission to the city council for its determination as to necessity or desirability. The authority may not be deemed to have the power of direction to the city council as to what territory should be annexed to the city. Nor in any event may the city by agreement surrender that power in the absence of express statutory authorization. If as here a county authority is in existence, that authority has

jurisdiction in the county territory. And the city is the body to determine in this instance, as in the initial determination of the necessity for a city housing authority, what territory should be added to the city for the purpose of the operations of the city housing authority. The court will not read into the statute an implied surrender of the city power to make the determination of desirability for the annexation. Since the statute does not authorize such surrender, the question of contractual obligation becomes immaterial. It follows that since the city does not have the power to surrender its discretion in the matter involved, and the authority does not have the right to make the determination for the city, there can be no conduct on the part of the city which will confer either.

The case of *Times-Mirror Co.* v. *Superior Court,* 3 Cal.2d 309 [44 P.2d 547], is inapplicable. In that case both the private corporation and the city of Los Angeles were performing acts within their respective rights and powers. Here we are concerned with two public bodies, each of which is controlled by express statutory provisions as to the powers and rights which each may exercise. There is no injury to the authority by the claimed deprivation of a right which it does not have, and which in fact the city could not confer under the statute. There is no justice nor equity in favor of the authority within the meaning of the decisions upon which it relies. Estoppel may not be invoked when the statute is the measure of the power. (*County of San Diego* v. *California Water Etc. Co.,* 30 Cal.2d 817, 822 [186 P.2d 124, 175 A.L.R. 747].) As in the cited case, there is in this instance no appropriate statutory authority pursuant to which an agreement as invoked by the authority could be made by the city. Consequently no legal duty of annexation has arisen. Whatever action has been taken by the city departments and the city council in connection with the proposed annexation must be deemed to be no more than acts in the determination that annexation might be desirable and should be accomplished.

In my opinion this court has no proper function to perform in the present proceeding either to direct the city council to cooperate by annexing the territory designated by the housing authority, or to hold the members of the city council in contempt for not so cooperating. I would dismiss the proceeding.

Edmonds, J., concurred.

SCHAUER, J., Dissenting.—I did not concur in the reasoning or the result in the preceding mandate proceeding (*Housing Authority* v. *City of Los Angeles* (1952), 38 Cal.2d 853 [243 P.2d 515]) and I do not agree with any implication therein or in either the majority opinion or Justice Shenk's dissent herein that the people (whether by direct vote, or through their governmental representatives, the city councilmen) may by contract irrevocably bargain away their legislative prerogatives. The right of the people to legislate whether by initiative or through elected representatives is the right of self-government. It means freedom instead of subservience to a master. The right to legislate must include the right to augment, to repeal and to amend as well as to enact. And the right of a city as a legal entity to contract should, as in the case of any other individual, natural or corporate, include the right to rescind on equitable grounds, or to breach and be subject to a suit for specific performance or to an action for ensuing damage liability.

The city of Los Angeles and the Housing Authority of the City of Los Angeles are, respectively, separate corporate entities. They entered into a contract and a dispute has arisen between them as to the performance of that contract. Their reciprocal rights and obligations and liabilities should be determined by the same judicial processes and by the same general laws as are applicable to other contracting parties.

The holding in the preceding mandate proceeding is in my view inherently contrary to sound public policy and in some respects I think it trenches on our most fundamental governmental and political institutions. I think that inevitably, if the theory that the people can by contract irrevocably surrender to an entity their right to legislate or otherwise govern themselves is persisted in and expanded (as politicians and sometimes courts are wont to do with attractively garbed theories) this seemingly isolated departure from accepted standards and procedures can prove to be a sorry breach in our constitutional dike.[1] But since the judgment in that case has become final, whether I like it or not, if it has any

---

[1]That the theory is already being expanded is made evident by the fact that the majority today, over the formal dissent of Mr. Justice Shenk who authored the mandamus opinion, are construing and applying the basic opinion to enforce acts not contemplated by its author and believed by him to be unlawful because related to property beyond the territorial jurisdiction of either of the contracting parties.

validity at all, it must be accepted and dealt with insofar as it clearly controls. However, assuming some area of validity and no disposition on the part of any of the justices to sap fundamentals, the judgment definitely should not be extended in implications or to ends which appear to be obnoxious to constitutional enterprise or which would transgress both democratic and republican concepts of the permissible functions of government.

If I assume for the prior judgment the full scope of validity, and give it all the virtue which its learned and respected author attributes to it, then I agree with that author as he dissents today in protest against the monstrosity which has been made of his opinion. That the mandamus opinion as construed and applied by the majority here seems monstrous to its author is evidenced by his dissent. That it should be so regarded by any lover and defender of our traditional constitutional processes is to me made apparent by the majority and concurring opinions. Such opinions, directly or impliedly, hold that:

a. The members of the council of the city of Los Angeles, although elected by the citizens as their representatives, have by contract with a corporation abdicated all legislative power within the field of the contract.

b. Within the contractual field the councilmen are bound to consider not the interests or will of the people but instead to obey implicitly the command of the contracting corporation.

c. The contract is irrevocable on the part of the citizens. Hence, the corporate dynasty has perpetual power.

d. The territory affected is not confined to the city of Los Angeles. The contracting and subservient city may be compelled to annex territory from other jurisdictions. (Whether the area of annexation may extend beyond county or state or national lines is not stated.)

e. If the councilmen dare to respect the will of the people who elected them, and disobey the orders of the corporate master, they shall be fined or imprisoned.

f. Within the field of contract the city must perpetually "co-operate" with the contracting corporation. And "co-operate," as used by the majority, means implicitly obey.

It is regrettable that in the affairs of men good ends are sometimes sought by unwise means. Here, no one questions

the desirability of better housing in place of poorer housing; certainly, better housing is a desirable end. But to alert defenders of the hard won constitutional freedoms no betterment of housing can justify a means which exchanges a city's —or a person's—freedom for subservience in a substantial area of government.

Whether we agree with the original mandate judgment or not, this proceeding should be dismissed.