[S.F. No. 23549. Sept. 15, 1977.]

LEONARD ROSS et al., Petitioners, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY,
Respondent;
MARION J. WOODS, as Director, etc., et al., Real Parties in Interest.

## COUNSEL

Baird B. McKnight, County Counsel, Downey, Brand, Seymour & Rohwer, John F. Downey and Stephen F. Boutin for Petitioners.

Daniel V. Blackstock, County Counsel (Butte), Thomas M. Kelly, County Counsel (Alpine), Noble Sprunger, County Counsel (El Dorado), Charles H. Frost, County Counsel (Glenn), Charles D. Houghton, County Counsel (Lake), Dawson Arnold, County Counsel (Lassen), John Paul Baker, County Counsel (Modoc), L. J. Dewald, County Counsel (Placer), Robert Rehberg, County Counsel (Shasta), Edward F. Buckner, County Counsel (Sutter), Henry Goff, County Counsel (Tehama), William R. Neill, County Counsel (Trinity), and James Ruddick, County Counsel (Yuba), as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Evelle J. Younger, Attorney General, N. Eugene Hill, Assistant Attorney General, Edmund E. White, John J. Klee, Jr., John Fourt, Byron B. Chell and Thomas E. Warriner, Deputy Attorneys General, David F. Chavkin, J. Kendrick Kresse, Andrea J. Saltzman, David J. Rapport and Ralph S. Abascal for Real Parties in Interest.

## OPINION

**TOBRINER, Acting C. J.**—Petitioners Leonard Ross, Joe Crivello, Larry Dean, Ole Olsen and Russell Papenhausen, members of the Plumas County Board of Supervisors, seek review of a judgment of the Sacramento County Superior Court finding them guilty of contempt for wilfully violating a court order requiring the payment of retroactive welfare benefits. The supervisors challenge the judgment of contempt on a number of grounds, claiming (1) that, as nonparties to the original court action, they were not bound by the earlier order; (2) that the contempt proceedings were improperly instituted because the complaining parties failed to exhaust an available administrative remedy prior to seeking the contempt sanction; and (3) that the judgment is invalid because the record does not affirmatively reflect that the trial court applied the appropriate burden of proof in finding them guilty of contempt. As we explain, we have determined that none of the contentions is meritorious, and accordingly we affirm the judgment.

### 1. The facts.

This contempt proceeding arises in the aftermath of this court's decisions in *California Welfare Rights Organization* v. *Brian* (1974) 11 Cal.3d 237 [113 Cal.Rptr. 154, 520 P.2d 970] and *Cooper* v. *Swoap* (1974) 11 Cal.3d 856 [115 Cal.Rptr. 1, 524 P.2d 97], invalidating several state administrative welfare regulations as incompatible with the governing statutory provisions. Several months after the rendition of the *Brian* and *Cooper* decisions, plaintiffs Laura Cooper, Hazel Wilks, and Ottilia Lott filed an amended complaint in the Sacramento County Superior Court which consolidated in a single class action the claims presented in both cases; because a new state official, Mario Obledo, had been appointed as Secretary of the Health and Welfare Agency in the interim, the suit was

reentitled Cooper v. Obledo.[1] The amended complaint sought declaratory and injunctive relief, including the payment of benefits improperly withheld in the past pursuant to the regulations invalidated in *Brian* and *Cooper.*

On July 28, 1975, the superior court entered judgment in the Cooper v. Obledo action, granting plaintiffs the relief sought in their amended complaint. With respect to the payment of retroactive welfare benefits, the injunctive order issued by the court provided: "The defendants, their successors in office, agents and employees will restore to plaintiffs and the class they represent the AFDC benefits unlawfully withheld pursuant to [the regulations invalidated in *Brian* and *Cooper*] through the following procedure: [¶] "a. . . . County welfare departments will redetermine AFDC eligibility and make restitution of grant amounts unlawfully withheld . . . [¶] d. Within 60 days after entry of this Judgment, or as soon thereafter as administratively possible, the Department of Benefit Payments will notify all county welfare departments of the terms of this judgment and the rights of claimants, and will instruct the counties to aid and assist claimants in obtaining restitution as appropriate including reviewing every case record . . . to determine if the AFDC grant was improperly reduced by application of [the invalid regulations]."

Pursuant to this judgment, on September 18, 1975, the Department of Benefit Payments sent an "all-county letter" to each county welfare director, ordering the counties to compute and pay the retroactive welfare grants as mandated in the court order; the department attached a copy of the judgment in Cooper v. Obledo to the letter. Mona Green, the Plumas County Welfare Director, received this letter shortly thereafter and, at the November 11, 1975, meeting of the Plumas County Board of Supervisors, she informed the board of the contents and effect of the letter and the court judgment. The board immediately instructed Green not to make the retroactive payments and adopted a motion, resolving "that Plumas County not comply with the court order, as this would be an unanticipated expense for which no county funds are available."

The Director of Benefit Payments, real party in interest Marion Woods,[2] immediately advised the board of supervisors by telegram that

---

[1] The amended complaint named Obledo and Jerry Prod, Director of Benefit Payments, as defendants.

[2] Woods is the successor in office to Jerry Prod, one of the original defendants in the Cooper v. Obledo action. (See fn. 1, *ante.*)

if the board did not rescind its action of November 11, he would seek a contempt order.[3] The telegram was read at a meeting of the board on November 18, 1975, but the board refused to alter its position and voted to notify the director " . . . that the Plumas County Board of Supervisors does not intend to rescind its decision not to comply with the court order."

Thereafter, on December 3, 1975, real parties in interest Woods, Cooper, Wilks and Lott filed a motion in the Sacramento Superior Court urging that petitioners be held in contempt for wilfully violating the Cooper v. Obledo order; an affidavit of Director Woods accompanied the motion. At the hearing on the contempt motion held on January 22 and 23, 1976, real parties in interest adduced evidence establishing the above facts. In addition, real parties in interest presented the testimony of Ann Patton, the Plumas County Auditor-Controller, who stated that as of the date of the contempt hearing "around $100,000" remained in the county's "contingency appropriation" for the current fiscal year; Mona Green, the county welfare director, estimated the cost to Plumas County of the retroactive welfare payments mandated by the Cooper v. Obledo order at between $10,000 and $20,000. Petitioners did not challenge the accuracy of these officials' testimony.

At the conclusion of the hearing, the trial court adjudged petitioners guilty of contempt, specifically finding that petitioners had actual knowledge of the court order, that "funds were and are available . . . with which to comply" and that petitioners nonetheless wilfully refused to comply with the judgment.[4] The court postponed sentencing for two weeks to give petitioners another opportunity to purge themselves of contempt by agreeing to comply with the court order. At sentencing, petitioners remained resolute in their refusal to comply and the court thereupon fined each of the petitioners $500. The court stayed execution of the sentence pending this review.

[3]The telegram read in full: "The policy of this administration is to carry out court orders even when we do not agree with them. Based on this policy, unless you act before 5 p.m., Thursday, November 20, 1975, to rescind action taken last week not to impliment [sic] order in Cooper decision, I intend to seek an order holding you in contempt of court. Please advise your intention."

[4]As the record reflects, the trial court stated from the bench: "The court believes that there is enough evidence here to justify finding that the defendants are guilty of contempt . . . . I believe that the evidence showed, number one, that the defendants had been noticed of the judgment; number two, they wilfully refused to comply with the judgment; and number three, that funds were available and are available in the general fund with which to comply. So we have the three ingredients, actual notice, wilfull refusal to abide by the judgment and ability to comply. . . . So, I find that the

2. ▆▆▆ *In administering the payment of welfare benefits, the Plumas County Board of Supervisors acts as an agent of the California Department of Health and Welfare and consequently the supervisors were bound by the injunction rendered in Cooper v. Obledo.*

Petitioners initially contend that the judgment of contempt is invalid because they were not bound by the injunctive order which the trial court found they had wilfully disobeyed. Petitioners emphasize that neither Plumas County nor they, as individuals, were named defendants in the Cooper v. Obledo action, and that they received no notice and were afforded no opportunity to defend that action. Under these circumstances, petitioners urge that they were denied due process by being held in contempt for violating the injunctive order issued in that case.

The United States Supreme Court faced and explicitly rejected an almost identical due process contention over three-quarters of a century ago in *In re Lennon* (1897) 166 U.S. 548 [41 L.Ed. 1110, 17 S.Ct. 658]. In *Lennon,* an employee of a railroad company who had been found in contempt for violating the terms of an injunction issued against his employer, maintained that the contempt judgment was invalid in that he had not personally been a party to the action in which the injunction had been issued. The Supreme Court responded: "The ·facts that [the employee] was not a party to such suit, nor served with process of subpoena, nor had notice of the application made by the complainant for the mandatory injunction, nor was served by the officers of the court with such injunction are immaterial, so long as it was made to appear that he had notice of the issuing of an injunction by the court. To render [an employee] amenable to an injunction it is neither necessary that he should have been party to the suit in which the injunction was issued, nor to have been actually served with a copy of it, so long as he appears

---

defendants—the individual defendants who are members of the Board of Supervisors of Plumas County are in contempt and guilty of contempt." A minute order, reflecting these findings, was entered; the record does not disclose any request by petitioners for additional findings.

Contrary to petitioners' contention, the court's order does recite "sufficient facts, with sufficient particularity, to show that . . . contempt has been committed." (*Kroneberger* v. *Superior Court* (1961) 196 Cal.App.2d 206, 209 [16 Cal.Rptr. 339]; see generally 5 Witkin, Cal. Procedure (2d ed. 1971) Enforcement of Judgment, § 169, p. 3530.) Moreover, contrary to petitioners' assertion at oral argument, the record leaves no doubt that petitioners were at all times aware that the contempt proceeding related solely to their failure to comply with the portion of the Cooper v. Obledo order requiring retroactive welfare payments.

to have had actual notice. [Citations.]" (166 U.S. at p. 554 [41 L.Ed. at p. 1113].)

In *Berger* v. *Superior Court* (1917) 175 Cal. 719, 721 [167 P. 143, 15 A.L.R. 373], our court reiterated and explained the contours and basic rationale of the rule applied in *Lennon*. We stated: "In matters of injunction . . . it has been a common practice to make the injunction run also to classes of persons through whom the enjoined person may act, such as agents, servants, employees, aiders, abettors, etc., though not parties to the action, and this practice has always been upheld by the courts, and any of such parties violating its terms with notice thereof are held guilty of contempt for disobedience of the judgment. . . . [T]he whole effect of this is simply to make the injunction effectual against all through whom the enjoined party may act, and to prevent the prohibited action by persons acting in concert with or in support of the claim of the enjoined party, who are in fact his aiders and abettors." (Italics omitted.) (See, e.g., *Pitchess* v. *Superior Court* (1969) 2 Cal.App.3d 653, 656 [83 Cal.Rptr. 41]; *Mattos* v. *Superior Court* (1939) 30 Cal.App.2d 641, 647 [86 P.2d 1056].)

In the instant case, of course, the injunctive order in the Cooper v. Obledo action was directed at "agents" of the defendants, and the judgment contemplated that individual counties would be bound by the order. As we have seen, the judgment specifically provided that "defendants, their successors in office, *agents* and employees will restore to plaintiffs and the class they represent the AFDC benefit unlawfully withheld," and the procedure for repayment established by the judgment explicitly stipulated that "[c]ounty welfare departments will redetermine AFDC eligibility and make restitution of grant amounts unlawfully withheld" pursuant to the invalid regulations.

Petitioners do not challenge the continued vitality of *Berger's* conclusion that an agent is bound by an injunction issued against his principal (see, e.g., *Regal Knitwear Co.* v. *Board* (1945) 324 U.S. 9, 13-14 [89 L.Ed. 661, 666-667, 65 S.Ct. 478]), nor the fact that the Cooper v. Obledo judgment intended to compel the county to pay retroactive welfare benefits. Petitioners contend, however, that the Cooper v. Obledo court lacked the power to bind absent counties because, in petitioners' view, counties and their respective boards of supervisors are not "agents" of the state in this context. As we explain, the governing statutory provisions and a long and uniform line of judicial precedents conclusively refute petitioners' contention.

The statutory provisions governing the administration of the state welfare system are contained in division 9, part 2 of the Welfare and Institutions Code, commencing with section 10550. Section 10550 provides for the establishment, within the state Health and Welfare Agency, of a Department of Benefit Payments, and section 10600 states in relevant part: "It is hereby declared that provision for public social services in this code is a matter of statewide concern. The Department of Benefit Payments is hereby designated as the single state agency with full power to supervise every phase of the administration of aid . . . for which grants-in-aid are received from the United States government or made by the state in order to secure full compliance with the applicable provisions of state and federal laws." (See also Welf. & Inst. Code, § 10603.)

After establishing the Department of Benefit Payments as the "single" supervisory agency in this field, the code goes on, in section 10800, to assign responsibility for the local administration of state welfare laws to county boards of supervisors, who are to establish county welfare departments, headed by a county welfare director.[5] Section 10802 provides, in turn, that the county welfare director, who acts "for and in behalf of the board of supervisors," "shall abide by all lawful directives of the [Department of Benefit Payments] relating to aid. . . ." (See also Welf. & Inst. Code, §§ 10809, 10825, 10826, 10827.)

Thus, the statutes establish an administrative hierarchy in which the state Department of Benefit Payments exercises ultimate supervisory authority over the payment of welfare benefits and the county boards of supervisors, acting through the county welfare departments, function as agents of the Department of Benefit Payments in administering such payments.

---

[5]Section 10800 provides in full: "Subject to the provisions of Section 11050 and Chapter 3 (commencing with Section 12000) of Part 3, the administration of public social services in each of the several counties of the state is hereby declared to be a county function and responsibility and therefore rests upon the boards of supervisors in the respective counties pursuant to the applicable laws, and in the case of public social services for which federal or state funds are provided, subject to the regulations of the department.

"For the purpose of providing for and carrying out this function and responsibility, the board of supervisors of each county, or other agency as may be otherwise provided by county charter, shall establish a county department, unless otherwise provided by the county charter. Except as provided herein, the county department shall be the county agency for the administration of public social services and for the promotion of public understanding of the public social services provided under this code and the problems with which they deal."

The existence of such a principal-agent relationship between the state welfare agency and the county boards of supervisors is confirmed by a long and unbroken line of California decisions. Over 40 years ago, in *San Francisco* v. *Collins* (1932) 216 Cal. 187, 191-192 [13 P.2d 912], this court declared: "The duty to relieve the indigent, established by state statutes, is . . . a matter of statewide interest, in which the city and county of San Francisco is governed by the general law, *and acts as . . . an agent of the state.*" (Italics added.) Eight years later, in *County of Alameda* v. *Janssen* (1940) 16 Cal.2d 276, 284 [106 P.2d 11, 130 A.L.R. 1141], we again noted that "county boards of supervisors . . . [act] as agents for the state in dispensing old age relief." More recently, in *Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 679 [94 Cal.Rptr. 279, 483 P.2d 1231], we reiterated the teachings of *Collins* and *Janssen,* declaring that "[i]n administering General Assistance relief the county acts as an agent of the state." In addition, several Court of Appeal decisions have explicitly held that the county acts as an agent of the state in the administration of the AFDC programs involved in the instant case. (See *County of Marin* v. *Martin* (1974) 43 Cal.App.3d 1, 3-4 [117 Cal.Rptr. 364]; *County of Contra Costa* v. *Social Welfare Board* (1962) 199 Cal.App.2d 468, 473 [18 Cal.Rptr. 573]; cf. *Ramos* v. *County of Madera* (1971) 4 Cal.3d 685, 693-694 [94 Cal.Rptr. 421, 484 P.2d 93].)

Petitioners attempt to avoid this extensive array of authority by asserting that the county is only a "special agent," rather than a "general agent," of the state welfare agency, and is consequently not bound by an injunctive order issued against the state agency. This argument is flawed on two levels. First, absolutely nothing in either the statutory provisions or the prior authorities supports the petitioners' classification of counties as special agents. Civil Code section 2297 provides that "[a]n agent for *a particular act or transaction* is called a special agent [and] [a]ll others are general agents," (italics added), and section 3 of the Restatement Second of Agency explains that "(1) A general agent is an agent authorized to conduct a series of transactions involving a continuity of service. (2) A special agent is an agent authorized to conduct a single transaction or a series of transactions *not involving continuity of service.*" (Italics added.) ■ Inasmuch as county boards of supervisors bear an on-going statutory responsibility for the local administration of welfare benefits, such boards of supervisors are clearly general agents of the state welfare agency with respect to such administrative duties.

Moreover, nothing in either the *Berger* decision or the numerous cases following *Berger* supports petitioners' suggestion that a special agent is

not bound by an injunctive order that directly relates to actions falling within the scope of his special agency. (See, e.g., *Kirby* v. *San Francisco Sav. & Loan Soc.* (1928) 95 Cal.App. 757 [273 P. 609].) Indeed, the fundamental rationale of *Berger* demonstrates that a special agent would necessarily be bound in such an instance, because, if he were not, a principal could avoid the force of an injunction simply by acting through special agents rather than general agents. " '[C]ourts do not look with indulgence upon schemes, however skillfully devised, designed to thwart their orders.' " (*Morton* v. *Superior Court* (1884) 65 Cal. 496, 497 [4 P. 489].) Since the Department of Benefit Payments could comply with the provisions of the Cooper v. Obledo order requiring the payment of retroactive welfare benefits only through the actions of county welfare departments, it is clear that such counties could not disobey the order with impunity.[6]

█ Accordingly, we conclude that petitioners' contention that they are not bound by the injunctive order issued in Cooper v. Obledo is specious.[7]

---

[6]Contrary to the dissent's assertions, petitioners' status as elected members of a county board of supervisors does not insulate them from the force of all court orders or preclude the entry of a judgment of contempt against them. It is by now well established, of course, that administrative functions of a board of supervisors are not immune from judicial process and may be mandated or enjoined (see, e.g., *Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 343-345 [124 Cal.Rptr. 513, 540 P.2d 609]), and that supervisors who wilfully disobey such a court order may be subjected to punishment through the contempt sanction. (See, e.g., *City of Vernon* v. *Superior Court* (1952) 38 Cal.2d 509 [241 P.2d 243]; *City of Culver City* v. *Superior Court* (1952) 38 Cal.2d 535 [241 P.2d 258]. See generally Annot. (1924) 30 A.L.R. 148, 151-153.)

Moreover, in light of the dissent's argument, it bears emphasis that a county's duty to pay welfare benefits derives ultimately from statutes enacted by the *state Legislature,* and not from judicial initiative. In this context, any "political solution" that the county seeks must be obtained by petitioning the Legislature to revise existing state statutes, rather than by disobedience of the governing law.

[7]Although petitioners did not raise the argument before the superior court, they now briefly maintain that the Cooper v. Obledo case was, in part, incorrectly decided; petitioners contend that the portion of the judgment implementing this court's unanimous decision in *Brian* is erroneous under the subsequent United States Supreme Court decision in *Burns* v. *Alcala* (1975) 420 U.S. 575 [43 L.Ed.2d 469, 95 S.Ct. 1180]. This contention is clearly unsound on several grounds. First, even if the Cooper v. Obledo decision was based on an error of substantive law, such error constitutes no defense to a contempt conviction so long as the court had jurisdiction to issue the order. (See *In re Berry* (1968) 68 Cal.2d 137, 148 [65 Cal.Rptr. 273, 436 P.2d 273]; *Signal Oil etc. Co.* v. *Ashland Oil etc. Co.* (1958) 49 Cal.2d 764, 778 [322 P.2d 1]; *Brady* v. *Superior Court* (1962) 200 Cal.App.2d 69 [19 Cal.Rptr. 242].) Petitioners demonstrate no such lack of jurisdiction within the meaning of the governing authorities. Moreover, our *Brian* decision was explicitly based on our interpretation of California's statutory welfare scheme (see 11 Cal.3d at pp. 240-241), and thus is not affected by the Supreme Court's subsequent interpretation of federal legislation in *Burns.*

█

3. *The contempt proceeding was not barred by a failure to exhaust an available administrative remedy.*

■  Petitioners secondly contend that even if they were bound by the injunctive order issued in Cooper v. Obledo, the trial court nonetheless erred in entertaining the contempt proceeding because the real parties in interest had assertedly failed to exhaust an available administrative remedy prior to seeking the contempt order. Petitioners present no authority which supports their contention that the exhaustion of administrative remedies doctrine applies to contempt proceedings, and we have serious doubts that the availability of an alternative remedy would necessarily deprive a court of the authority to punish wilful violation of its own orders through the contempt sanction. Even if we were to assume, however, that the exhaustion of remedies doctrine might be applicable in contempt proceedings under some circumstances, petitioners' invocation of the doctrine in the instant case is misguided for several reasons.

Petitioners argue that the real parties in interest should have pursued the remedy provided by Welfare and Institutions Code section 10605 before instituting the contempt proceeding at issue here. Section 10605 provides that if the Director of Benefit Payments "considers a county director to be failing, in a substantial manner, to comply with any provision of this code or any regulation," the state director shall notify the county director to that effect, and if the county director does not give reasonable assurance within 60 days of such notice "that he is complying and will continue to comply with the laws and regulations," the state director shall hold a hearing to consider the matter. If, after the hearing, the state director determines "that there is a failure on the part of the county to comply with the provisions of this code or the established regulations," section 10605 authorizes the state director to (1) "withhold part or all of state and federal funds from such county," (2) "[a]ssume, temporarily, direct responsibility for the administration of any or all state-assisted aid programs in such county," or (3) "[b]ring an action . . . to compel compliance."[8] Because the state director did not follow this procedure before instituting the instant contempt proceedings, petitioners claim that the real parties in interest failed to exhaust an available administrative remedy.

---

[8]Section 10605 provides in full: "If the director considers a county director to be failing, in a substantial manner, to comply with any provision of this code or any regulation, pertaining to the administration of aid, the director shall put the county director on written notice to that effect, and shall give a copy of the notice to the board of

The initial defect in petitioners' argument is simply that, at the time of the institution of the present contempt proceeding, the county's refusal to pay retroactive welfare benefits did not fall within the ambit of section 10605. Section 10605, by its terms, applies only to a county's failure to comply "with any provisions of this code or any regulation," and although numerous court decisions have articulated the general rule that welfare benefits which have been unlawfully withheld must be repaid retroactively (see, e.g., *Bd. of Soc. Welfare* v. *County of L.A.* (1945) 27 Cal.2d 81, 85-86 [162 P.2d 630]; *Leach* v. *Swoap* (1973) 35 Cal.App.3d 685, 689-692 [110 Cal.Rptr. 62]; *Mooney* v. *Pickett* (1972) 26 Cal.App.3d 431, 435-436 [102 Cal.Rptr. 708]), at the time of the instant contempt proceeding, this principle was not embodied in any statutory provision or

---

supervisors.

"If within 60 days the county director fails to give reasonable assurance that he is complying and will continue to comply with the laws and regulations, the director shall order the county to appear at a hearing, before the director, with the State Benefits and Services Advisory Board, to show cause why the director should not take action to secure compliance. The county shall be given at least 30 days' notice of such hearing. The director shall consider the case on the record established at the hearing, and the advice of the State Benefits and Services Advisory Board, and, within 30 days, shall render proposed findings and a proposed decision on the issues. The proposed findings and decision shall be submitted to the county, and the county shall have an opportunity to appear within 10 days at such time and place as may be fixed by the director, for the purpose of presenting oral arguments respecting the proposed findings and decision. Thereupon the director shall make his final findings and decision.

"If the director determines that there is a failure on the part of the county to comply with the provisions of this code or the established regulations, or if the State Personnel Board certifies to the director that a county is not in conformity with established merit system standards under Part 2.5 (commencing with Section 19800) of Division 5 of Title 2 of the Government Code, and that administrative sanctions are necessary to secure compliance, the director may invoke any of the following sanctions:

"(a) Withhold part or all of state and federal funds from such county until the county shall make a showing to the director of compliance; or

"(b) Assume, temporarily, direct responsibility for the administration of any or all state-assisted aid programs in such county until the county shall provide reasonable assurance to the director of its intention and ability to comply with such laws and regulations. During such period of state administrative responsibility for county programs, the director or his authorized representative shall have all of the powers and responsibilities of the county director, with the exception that he shall not be subject to the authority of the board of supervisors; or

· "(c) Bring an action in mandamus or such other action in court as may be appropriate to compel compliance. Any such action shall be entitled to a preference in setting a date for a hearing.

"Nothing in this section shall be construed as relieving the board of supervisors of the responsibility to provide funds necessary for the continued aid required by law.

"Nothing contained in this section shall be construed as preventing a county from seeking judicial review of action taken by the secretary pursuant to this section under Section 1094.5 of the Code of Civil Procedure, or except in cases arising under Sections 10962 and 10963, from seeking injunctive relief when deemed appropriate."

administrative regulation.[9] Consequently, section 10605 did not provide an "available" remedy to which the director could have resorted.

Moreover, the remedy provided by section 10605 is, in any event, available only to the Director of Benefit Payments and not to individual aggrieved welfare recipients. Inasmuch as the contempt proceeding in this case was pursued by the individual Cooper v. Obledo plaintiffs as well as by the director it is clear that the proceeding was not barred by the exhaustion of remedies doctrine.

The case of *Diaz v. Quitoriano* (1969) 268 Cal.App.2d 807 [74 Cal.Rptr. 358] is directly on point. In *Diaz,* welfare recipients brought an action against Sutter County, claiming that the county had refused to comply with some aspects of the AFDC program mandated by state and federal law; the county argued the action should be dismissed because the recipients had failed to exhaust the administrative remedy embodied in section 10605. The *Diaz* court rejected the contention, explaining that section 10605 "is not an 'administrative remedy' within the exhaustion of remedies doctrine. '. . . . Our courts have repeatedly held that the mere possession by some official body of a continuing supervisory or investigatory power does not itself suffice to afford an "administrative remedy" unless the statute or regulation under which that power is exercised establishes clearly defined machinery for the submission, evaluation and resolution of *complaints by aggrieved parties.*' . . . (*Rosenfield v. Malcolm* (1967) 65 Cal.2d 559, 566 [55 Cal.Rptr. 505, 421 P.2d 697].)" (Italics added in *Diaz.*) (268 Cal.App.2d at pp. 812-813.) Section 10605 provides no such machinery for the submission or resolution of complaints by individually aggrieved parties.

Accordingly, we conclude that the exhaustion of remedies doctrine did not constitute a bar to the instant contempt proceedings.

4. *Petitioners have not demonstrated that the trial court applied an erroneous burden of proof standard in this proceeding.*

[9]Some time after the present contempt judgments were entered, the Director of Benefit Payments promulgated regulations to allow him to invoke sanctions pursuant to section 10605 whenever a county refuses to obey a court judgment. The subsequent establishment of this remedy has no effect on the present case, of course, for a party is not required to exhaust a remedy that was not in existence at the time the action was filed. (See *Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 543-544 [63 Cal.Rptr. 21, 432 P.2d 717].)

Finally, petitioners contend that the challenged order is invalid because the record does not affirmatively reflect that the trial court applied the correct standard of burden of proof in finding petitioners guilty of contempt. As we explain, we have concluded that this argument, like the prior two contentions, is unsound.

For almost a century, our court has repeatedly emphasized that in California all contempt proceedings are quasi-criminal in nature and that, as a consequence, "an accused on trial for contempt must be proved guilty beyond a reasonable doubt." (*Bridges* v. *Superior Court* (1939) 14 Cal.2d 464, 485 [94 P.2d 983], revd. on other grounds, 314 U.S. 252 [86 L.Ed. 192, 62 S.Ct. 190, 159 A.L.R. 1346]; see, e.g., *In re Buckley* (1886) 69 Cal. 1, 3 [10 P. 69]; *Hotaling* v. *Superior Court* (1923) 191 Cal. 501, 505 [217 P. 73, 29 A.L.R. 127].) We reiterated this principle recently in *In re Coleman* (1974) 12 Cal.3d 568, 572 [116 Cal.Rptr. 381, 526 P.2d 533], explaining that "[b]ecause of the penalties imposed, a proceeding to punish an accused for contempt is criminal in nature, and guilt must be established beyond a reasonable doubt." All parties to this action agree that the trial court was obliged to utilize the reasonable doubt standard in the instant case.

Petitioners point out that the record in this case does not affirmatively demonstrate that the trial court applied the reasonable doubt standard in reaching his conclusion, and they contend that the absence of such an affirmative showing fatally flaws the judgment of contempt. Petitioners' argument, in essence, is that in the absence of an explicit statement by the trial court indicating that he was applying the reasonable doubt standard, error must be presumed.

Controlling legal principles, however, establish precisely the opposite result. Evidence Code section 664 provides that "[i]t is presumed that official duty has been regularly performed" and scores of appellate decisions, relying on this provision, have held that "in the absence of any contrary evidence, we are entitled to presume that the trial court . . . properly followed established law." (*Serrano* v. *Workman's Comp. Appeals Bd.* (1971) 16 Cal.App.3d 787, 790-791 [94 Cal.Rptr. 511].) This rule has been applied in both civil (see, e.g., *In re Marriage of Drivon* (1972) 28 Cal.App.3d 896, 898 [105 Cal.Rptr. 124]; *Serrano* v. *Workman's Comp. Appeals Bd., supra,* 16 Cal.App.3d 787, 790-791) and criminal (*People* v. *Sparks* (1968) 262 Cal.App.2d 597, 600-601 [68 Cal.Rptr. 909]; *People* v. *Pruitt* (1957) 155 Cal.App.2d 585, 592 [318 P.2d 552]) proceedings and a number of criminal cases unequivocally hold that the

rule encompasses a presumption that the trial court applied the proper burden of proof in matters tried to the court. (See, e.g., *People* v. *Clements* (1962) 202 Cal.App.2d 284, 286 [20 Cal.Rptr. 566]; *People* v. *Stroud* (1969) 273 Cal.App.2d 670, 678-679 [78 Cal.Rptr. 270].)[10] In the typical criminal case in which a jury trial is waived, the judge, of course, does not normally publicly announce that he is applying the reasonable doubt standard, but simply finds the defendant guilty or not guilty of the charged offense. (See *People* v. *Stroud, supra,* 273 Cal.App.2d 670, 679.)

In support of their contention that the record must affirmatively reflect that the trial court applied the reasonable doubt standard, petitioners rely solely on this court's recent decision in *In re Arthur N.* (1976) 16 Cal.3d 226 [127 Cal.Rptr. 641, 545 P.2d 1345], a case that is readily distinguishable from the instant matter. In *Arthur N.* we addressed the question of the appropriate burden of proof standard to be applied when a juvenile who is already a ward of the court is charged, pursuant to a supplemental petition filed under section 777 of the Welfare and Institutions Code, with having engaged in acts of misconduct which warrant more restrictive custody or supervision. Although acknowledging that the supplemental petition procedure of section 777 bears a superficial resemblance to a probation revocation hearing 'in which charged violations need be proved only by clear and convincing evidence, we ultimately concluded that because a supplemental petition would, in practice, frequently result in the imposition of a much greater sanction than the juvenile faced as a result of his original wardship proceeding, the allegations of the supplemental petition must be proved beyond a reasonable doubt. (16 Cal.3d at pp. 236-240.)

After reaching this conclusion, we did reverse the juvenile court order at issue because the record did not affirmatively reflect that the court had applied the reasonable doubt standard in adjudicating the supplemental petition. In arriving at that disposition, however, we specifically relied

---

[10]Petitioners, relying on broad statements in some earlier cases to the effect that "no intendments or presumptions can be indulged in aid" of a judgment of contempt (e.g., *Hotaling* v. *Superior Court, supra,* 191 Cal. 501, 506; but *cf. Rosin* v. *Superior Court* (1960) 181 Cal.App.2d 486, 490-492 [5 Cal.Rptr. 421]), suggest that the presumption that official duty was regularly performed is inapplicable to contempt proceedings. Petitioners, however, have failed to identify a single case in which a contempt order was reversed because the trial court failed to state. on the record that it was applying the reasonable doubt standard. In *In re Ciraolo* (1969) 70 Cal.2d 389, 393 [74 Cal.Rptr. 865, 450 P.2d 241], by contrast, we stated with respect to the requirements of an order finding an individual guilty of direct contempt that "[a]ll that is required is that an order be made reciting the facts constituting the contempt, adjudging the person guilty and prescribing the punishment. [Citations.]"

upon the fact that the initial judicial decision articulating the applicability of the reasonable doubt standard in section 777 proceedings had been rendered "long after the hearing in issue [in *Arthur N.*] was conducted" (16 Cal.3d at p. 240); under those circumstances, of course, there was a substantial danger that the trial court in *Arthur N.* had not accorded the juvenile the benefit of the reasonable doubt standard.

By contrast, the applicability of the reasonable doubt standard to contempt proceedings has, as noted above, been firmly established in a long line of California decisions, and thus in the instant case there is no reason to depart from the normal presumption that the trial court properly followed established law. Nothing in the present record suggests that the trial court was ignorant of the controlling decisions establishing the reasonable doubt standard or that the court had decided to depart from those decisions. Indeed, the record affirmatively reflects that the trial court was well aware of the quasi-criminal nature of contempt proceedings.[11]

Conceding that the record does not reveal that the trial court utilized the wrong burden of proof standard, petitioners attempt to rebut the statutory presumption of regularity through an affidavit, filed by their attorney, which states that in an unreported conference in the judge's chambers, the judge indicated that he was going to apply the "preponderance of the evidence," rather than the "reasonable doubt," burden of proof standard.[12] Even if we assume that the presumption of regularity may be rebutted by reference to matters outside the record (but cf. *People* v. *Heath* (1955) 131 Cal.App.2d 172, 174 [280 P.2d 70]), however, we cannot find that petitioners have shouldered their burden of proof in this case, because the affidavit filed by their attorney is directly contradicted by three affidavits filed by counsel for real parties in interest, which state that the trial court indicated in chambers that it felt that the evidence established "beyond a reasonable doubt" that petitioners were guilty of contempt.[13]

[11] On several occasions, the court specifically noted that "this is not a civil case; this is a quasi criminal [matter]."

[12] The affidavit filed by petitioners' attorney states in relevant part: "Judge Shreck concluded by stating that he was going to apply the civil standard of proof, a preponderance of the evidence, to the contempt proceeding."

[13] The three affidavits filed by the attorneys of the real parties in interest state in relevant part: (1) "Judge Shreck stated that on the basis of the exhibits and testimony received in evidence, he was prepared to find the petitioners guilty of contempt under either the 'beyond a reasonable doubt' or the 'preponderance of evidence' burden of proof rule of evidence." (2) "[Petitioners' counsel] then stated that he was concerned that

Indeed, as the real parties in interest suggest, a review of the entire record in this case demonstrates quite clearly that the petitioners never seriously contested the facts underlying the finding of contempt.[14] Petitioners conceded that they had received notice of the court order in Cooper v. Obledo and had knowingly voted to defy the order; petitioners did not challenge the testimony of the county officials which established beyond question that the county had the financial ability to comply with the order.[15] On this record, the trial court could reach no other conclusion but that petitioners were guilty of the contempt.

The judgment is affirmed.

the record failed to reflect what standard of proof was employed by the Court in reaching its decision. . . . Judge Shreck cut [petitioners' counsel] short, stating that on one seriously contended that the supervisors were not in contempt and that the evidence presented at the hearing clearly established beyond a reasonable doubt all the necessary elements." (3) "[Petitioners' counsel] expressed his concern that the decision of the Court failed to include the legal standard employed by the Court in weighing the evidence, and that this would be necessary on appeal. . . . Judge Shreck then responded that the evidence presented at the hearing clearly established beyond a reasonable doubt that the supervisors were in contempt. He further stated that he was presumed to know the law."

[14]The record reflects that the refusal to comply with the court order at issue here was simply part of a larger, general policy of the Plumas County Board of Supervisors to refuse to participate in any federally or state-mandated welfare program. The record contains a copy of an official resolution unanimously adopted by the Plumas County Board of Supervisors on May 27, 1975, two months prior to the issuance of the Cooper v. Obledo judgment. That resolution states:

"Whereas, the economic condition of Plumas County is very depressed, and Whereas, it is becoming increasingly difficult for the taxpayers of Plumas County to support various Federal and State mandated programs by paying taxes out of their meager incomes, and Whereas, it is likewise increasingly difficult to adjust tax rates due to restrictions in the amounts that may be taxed which have been placed on counties such as Plumas by the State of California and Whereas, one of the largest State and Federal mandated programs from a tax standpoint is the social services operations of the Plumas County Welfare Department, and Whereas, it appears to this Board of Supervisors that the only way to present a workable budget is to eliminate the County's financial participation in said social services programs, Now, therefore, be it resolved, that effective July 1, 1975, Plumas County will no longer participate financially with the State and Federal Government in any social services programs mandated by the State or Federal Government."

[15]In the instant case public officials testified that sufficient funds were present in the county's budget to cover the cost of retroactive welfare payments mandated in Cooper v. Obledo, and on the basis of such testimony the court had little difficulty in finding that the county possessed the ability to comply with the court order. The strong showing made in the instant case, however, is by no means a prerequisite to a finding of contempt. In *City of Vernon v. Superior Court, supra*, 38 Cal.2d 509, and *City of Culver City v. Superior Court, supra*, 38 Cal.2d 535, our court upheld findings of contempt in cases in which city council members had simply failed to take reasonable steps to raise money needed to comply with a court order.

Richardson, J., Sullivan, J.,* and Devine, J.,† concurred.

**MOSK, J.**—I dissent.

My dissenting opinion in *Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 346, 350 [124 Cal.Rptr. 513, 540 P.2d 609], posed this dilemma:

"I am compelled to make an embarrassing inquiry. How do my learned colleagues propose to enforce their order? [¶] Naturally it is to be hoped that all good citizens will accept a final judicial determination of their rights and duties. But let us assume arguendo that the Glendale City Councilmen are intransigent, that they steadfastly refuse to vote to repeal [the offending ordinance] and to adopt another salary ordinance in its stead. Are my colleagues prepared to cite the entire legislative body for contempt of their order?"

The foregoing is no longer mere rhetoric; it now assumes monumental pragmatic proportions. The majority respond to my query about violating the separation of powers in the affirmative: they are indeed prepared to send an entire legislative body to jail for noncompliance with a judicial order. Yesterday, in *Glendale,* it was a city council. Today it is a county board of supervisors. Tomorrow the state Legislature?

In *Glendale* the city council had a moral obligation to comply with an agreement made with representatives of municipal employees. Here the supervisors, out of respect for the judicial process upon which our form of government depends, have an equally clear moral obligation to comply with the directives of *California Welfare Rights Organization* v. *Brian* (1974) 11 Cal.3d 237 [113 Cal.Rptr. 154, 520 P.2d 970], and *Cooper* v. *Swoap* (1974) 11 Cal.3d 856 [115 Cal.Rptr. 1, 524 P.2d 97]. I do not condone their refusal to do so.

However misguided the actions of the Plumas County board may be and however the supervisors' intransigence contributes to immobilizing orderly governmental processes, such persuasive moral imperatives do not invest the judiciary with the power to breach the wall of separation of powers. We simply cannot direct a legislative body to adopt a statute or

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Acting Chairman of the Judicial Council.

ordinance, whether it relates to employees' salaries, payments of welfare benefits, or any other subject requiring a vote of the body. After being selected by the electorate, every councilman, every supervisor, and every state legislator has an inviolate right to cast an "aye" or "nay" vote upon any subject before his body, and he must be able to do so conscientiously, without apprehensively glancing up at the Damoclean sword of a potential court citation for contempt. The legislators' responsibility is to their constituency, not to the judiciary.

I find nothing in the circumstances of this proceeding to justify carving out an exception to the venerable doctrine of separation of powers, such as, e.g., when the very ability of the judiciary to function is at stake (see *State* ex rel. *Edwards* v. *Murray* (1976) 48 Ohio St.2d 303 [2 Ohio Ops.3d 446, 358 N.E.2d 577]). Quite the contrary, the posture of the case cries out for invocation of judicial abstention.

It is true, as the majority state, that the trial court judgment in Cooper v. Obledo, the underlying action, directed the named defendants therein and their agents to restore welfare benefits improperly withheld. The significant issue, however, is whether the supervisors, not a party to the action, automatically become agents of Obledo and other state defendants for the purposes of this litigation. In an attempt to bridge the gap the majority cite numerous Welfare and Institutions Code sections, including those relating to state supervision of aid (§ 10603), providing for administration of state welfare laws by county boards of supervisors (§ 10800), and establishment of county welfare directors who shall abide by lawful state directives (§ 10802). None of those sections, assuming they could do so, declare that county supervisors—as distinguished from the county as an entity and county administrators as ministerial officers—become agents of a state bureau head. Indeed, it is utterly incongruous to suggest that *elected* public officials of one governmental entity can, by some *ipse dixit*, be declared agents of an *appointed* administrative officer of an entirely distinct branch of government, and thus be responsible for compliance with court orders made not to them but to their purported principal.

Authorities cited by the majority are not apposite, and the quotations are loose generalities taken out of context. *San Francisco* v. *Collins* (1932) 216 Cal. 187 [13 P.2d 912], involved the right of county supervisors

in the depths of the Great Depression to propose a bond issue for relief of the indigent sick and dependent poor. To indicate that the subject of providing relief was not entirely preempted by the state, the court declared that in issuing bonds for such purposes the county was acting as an agent of the state. *County of Alameda* v. *Janssen* (1940) 16 Cal.2d 276 [106 P.2d 11, 130 A.L.R. 1141], involved the power of the county to release liens upon the property of recipients of aid. *Mooney* v. *Pickett* (1971) 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231], involved the failure of an appointive county public health director to comply with a statute. In no case cited by the majority has an elected official of a county been held to be an agent of an appointed state bureaucrat.

Admittedly there would be chaos if state welfare programs, such as those involved in *Brian* and *Cooper*, could be ignored or emasculated by the perversity of individual county administrators. The Legislature anticipated this untoward possibility in the adoption of Welfare and Institutions Code section 10605 (see *ante,* pp. 910-911, fn. 8 of majority opn. for the full text). The section provides for notice to the county director who is remiss, and for a hearing. Thereafter if the county continues its failure to comply with state laws and regulations, the state has three options: first, to withhold state and federal funds from the county; second, to assume direct responsibility for county administration—virtually to place the county in receivership; third, to bring appropriate court action. The court action, it should be noted, is authorized if the state considers a *county director* to be failing, not the board of supervisors.

Section 10605 does not provide an administrative remedy the exhaustion of which is a condition to judicial jurisdiction over contempt proceedings. But it does indicate there is a way out of an intergovernmental impasse short of resort to the compulsion of a jail sentence. There is, therefore, good reason why under these circumstances courts should abstain from invoking the draconian remedy of contempt against officials of a coordinate branch of government. (See *Housing Authority* v. *City of Los Angeles* (1953) 40 Cal.2d 682 [256 P.2d 4].)

Chief Justice John Marshall said of the Constitution in his dissent in *Ogden* v. *Saunders* (1827) 25 U.S. (12 Wheat.) 213, 351 [6 L.Ed. 606, 653]:

it contains "the language of restraint, not of coercion." We should speak in the same muted tones of forbearance.

I would annul the order of contempt.

Clark, J., and Brown (G. A.), J.,* concurred.

Petitioners' application for a rehearing was denied November 3, 1977. Bird, C. J., did not participate therein. Sullivan, J.,† participated therein. Mosk, J., and Clark, J., were of the opinion that the application should be granted.

---

*Assigned by the Acting Chairman of the Judicial Council.

†Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.