Opinion
 

 WALKER, J.
 

 Cheryl Conrad, Sandra Evans, Bryan Kemper, Ruben Obregon, Michael Ross, Johnny Schwab, Joanne Holden, Alice Gambino, and Jeffrey White appeal their misdemeanor convictions for disobedience of a lawful court order. (Pen. Code, § 166, subd. (a)(4).) Appellants are abortion protesters who were arrested for picketing in front of the Planned Parenthood clinic in Vallejo. The clinic has a valid court order enjoining the similar activity of Christine Williams, Solano Citizens for Life, “and their agents, representatives, employees and members, and each of them, and each and every person acting at the direction of or in combination or in concert with defendants.”
 
 [1]
 
 Appellants claim, first, that the trial judge applied the wrong legal standard to find that they acted “in concert” with the enjoined parties so as to make them liable for violating the injunction and, second, that, measured by the correct standard, the evidence was insufficient to sustain their convictions. We agree.
 

 Facts
 

 The Planned Parenthood clinic in Vallejo is situated at 990 Broadway, a “busy avenue, with light commercial establishments on either side of’ the clinic. A parking lot surrounds the premises, and two driveways cross the public sidewalk that borders the lot, providing access from Broadway to the clinic and other businesses. The injunction we construe here was issued on August 1, 1991,
 
 [2]
 
 after the enjoined parties had repeatedly obstructed the clinic entrances, interfered with traffic on the driveways, and harassed and intimidated clinic patients and staff. The injunction forbids specific harassing conduct and banishes the enjoined parties’ “picketing, demonstrating [and] counseling" activity to the sidewalk opposite the clinic on the other side of Broadway.
 

 Uncontradicted evidence adduced at a bench trial showed that on June 10, 1994, appellants White and Schwab, among others, picketed the clinic
 
 *900
 
 from the sidewalk that borders the parking lot. The clinic director, Lynde Ann Rouche, tried to hand them copies of the injunction, but they refused to take them, insisting that “it didn’t apply to them.” Rouche spoke to White, who, she knew from photographs, had an “important role with Operation Rescue of California.” White told her the protesters were there to “test the injunction” by “getting arrested.” Eventually, White and Schwab “chose to be arrested.” After they were cited and released, everyone left. Norman Reece, an enjoined party who pickets the Vallejo clinic “between one [and] five times a week,” observed the demonstration from his van, which was parked across the street.
 

 On July 11, 1994, appellants again picketed Planned Parenthood on the clinic side of Broadway. Again, Rouche tried to hand them copies of the injunction, and, again, they insisted it did not apply to them. Again, Reece drove up in his van, but when he slowed down, appellant Ross waved him away. Rouche testified, “Mr. Ross was frantically motioning [Reece] to continue on, indicating . . . ‘Go away.’ ” When Ross gestured, Reece drove away. Eventually, the Vallejo police arrested the protesters who refused to cross Broadway in accordance with the injunction.
 

 Kathleen Nolan, the executive associate for Planned Parenthood, testified that the clinic had a written policy, devised with legal counsel, outlining, among other things, the scope of the injunction. According to Nolan, “It stated that anybody who was doing the same things that those specific people had been enjoined against were acting in concert with those people.” In other words, she said, “the injunction covered anybody committing the same acts as the specific [enjoined] people made.” Rouche testified that she had the same understanding, and that she had served the injunction on pro-choice demonstrators as well as on appellants.
 

 After the prosecution rested, appellants made a motion for acquittal, which the court denied. Appellants’ testimony was all to the same effect: They were not members of Solano Citizens for Life, and did not know any of the enjoined parties. Most had traveled from other parts of California with a pro-life caravan of sorts, Operation Rescue’s “Summer of Missions,” a four-week camping trip and anti-abortion campaign with planned stops throughout the state. They had stopped in Vallejo expressly to test the limits of the injunction, which the California Supreme Court had recently upheld for the first time.
 
 [3]
 
 A flyer distributed by Operation Rescue of California,
 
 *901
 
 advertising the Summer of Missions, mentioned the Vallejo injunction specifically.
 
 [4]
 

 When he took the stand, Ross explained why he had motioned for Reece to leave: “[White] mentioned to me that there was another pro-lifer across the street that was named in the injunction and he, [White], . . . asked me to wave him off.” Ross denied knowing Reece, but he conceded that it was probably White’s intention to minimize contact with any enjoined party because “if that person was named on the injunction, it wouldn’t look good for us to have that person there.”
 

 The prosecutor made her closing argument, incorporating the statements she had made against appellants’ motion for acquittal: “[A] group of antiabortion protesters doing the very things that are enjoined in the permanent injunction with knowledge of the injunction are in a sense standing in the shoes of the named litigants.” “[Appellants say they are acting independently.] That’s playing games; that is the shell game. [<]Q That is just semantics. It’s clearly an intentional ploy to challenge the order and that’s exactly what they did and that’s why we’re here.”
 

 The trial judge found the appellants guilty, presumably on the legal theory he articulated before he denied their motion for acquittal: “First of all, I don’t think the concept of acting ‘in concert’ is so narrowly interpreted that it would allow a group to escape the restrictions of an injunction []or injunctive order by the expediency of simply saying they belong to an organization with a different name, despite the fact that they share a mutuality of purpose and that they are participating in the same prohibit[ed] activity.”
 

 
 *902
 
 1.
 
 The Injunction’s Scope
 

 Appellants argue that acting “in concert” with enjoined parties requires more than simply knowing of the injunction and acting in ways the parties are enjoined from acting. We agree.
 

 “Injunctions ... are remedies imposed for violations (or threatened violations) of a legislative or judicial decree.”
 
 (Madsen, supra,
 
 512 U.S. at p. 764 [114 S.Ct. at p. 2524].) They may work to deprive the enjoined parties of rights others enjoy precisely because the enjoined parties have abused those rights in the past.
 
 [5]
 
 As our Supreme Court said in
 
 Williams I,
 
 “Obviously the injunction at issue here is confined to petitioners, and properly so; they were the only ones found to have harassed clinic patients and staff. [Citations.]”
 
 (Williams I, supra,
 
 7 Cal.4th at p. 870, judgment vacated and cause remanded (1994) 513 U.S. 956 [115 S.Ct. 413, 130 L.Ed.2d 329].)
 

 Injunctions are not effective against the world at large.
 
 (Regal Knitwear Co.
 
 v.
 
 Board
 
 (1945) 324 U.S. 9, 13 [65 S.Ct. 478, 480-481, 89 L.Ed. 661]
 
 (Regal
 
 Knitwear); and see
 
 Williams I, supra, 1
 
 Cal.4th at p. 870 [“[a] restriction that enjoined all picketers in addition to petitioners would clearly have been overbroad”].) This is not just because the world at large is not fairly deemed likely to abuse constitutional rights; it is also because injunctions are fashioned and enforced without the safeguards that attend the passage and govern the enforcement of more general prohibitions. “Injunctions . . . carry greater risks of censorship and discriminatory application than do general ordinances. ‘[Tjhere is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally.’ [Citation.]”
 
 (Madsen, supra,
 
 512 U.S. at pp. 764-765 [114 S.Ct. at p. 2524].)
 

 On the other hand, as the trial court recognized, enjoined parties may not play jurisdictional “shell games.” They may not nullify an injunctive decree by carrying out prohibited acts with or through nonparties to the original proceeding.
 
 (Regal Knitwear, supra,
 
 324 U.S. at p. 14 [65 S.Ct. at p. 481];
 
 Roe
 
 v.
 
 Operation Rescue
 
 (3d Cir. 1995) 54 F.3d 133, 139 [“. . . an instigator of contemptuous conduct may not ‘absolve himself of contempt liability by leaving the physical performance of the forbidden conduct to others.’ ”].) “ ‘In matters of injunction ... it has been a common practice to make the injunction run also to classes of persons [with or] through whom
 
 *903
 
 the enjoined person may act . . .
 
 (Ross
 
 v.
 
 Superior Court
 
 (1977) 19 Cal.3d 899, 906 [141 Cal.Rptr. 133, 569 P.2d 727].) Any such nonparty who knowingly violates the terms of an injunction is subject to the contempt powers of the court. (See
 
 ibid.)
 

 It is clear from this language that, in addition to knowledge of the injunction, some actual relationship with an enjoined party is required to bring a nonparty actor within the injunction’s scope. An enjoined party, in other words, has to be demonstrably implicated in the nonparty’s activity. Mere “mutuality of purpose” is not enough. Here, it must be appellants’ actual relationship to an enjoined party, and not their convictions about abortion, that make them contemners.
 
 [6]
 
 In sum, we conclude that a nonparty to an injunction is subject to the contempt power of the court when, with knowledge of the injunction, the nonparty violates its terms
 
 with or for
 
 those who are restrained.
 

 Here, the prosecutor argued, and the trial court appeared to accept, that knowing of the injunction and doing what it forbade, without more, placed appellants “in concert” with the enjoined parties and, therefore, in contempt of the injunction. As we have explained, while knowledge is required, it is not alone enough to make a contemner of an independent actor. (Cf. Fed. Rules Civ.Proc., rule 65(d), 28 U.S.C.) We must determine, therefore, whether the evidence linking the enjoined parties to the appellants was sufficient to prove that appellants acted with or for them.
 

 2.
 
 Sufficiency of the Evidence
 

 “The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt.”
 
 (People
 
 v.
 
 Reilly
 
 (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) “[T]his inquiry does not require a court to ‘ask itself whether
 
 it
 
 believes that the evidence at the trial established guilt beyond a reasonable doubt.’ [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution,
 
 any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
 
 (Jackson
 
 v.
 
 Virginia
 
 (1979) 443 U.S. 307, 318-319 [99 S.Ct. 2781, 2789, 61 L.Ed.2d 560].) Still, “‘. . . we must resolve the issue in the light of the
 
 whole record
 
 . . . and may not limit our appraisal to isolated bits of evidence selected by the respondent. . . . [W]e must [then] judge whether the evidence of each of the essential elements ... is substantial; it is not enough for the respondent simply to point to
 
 *904
 
 “some” evidence supporting the finding
 
 (People
 
 v.
 
 Johnson
 
 (1980) 26 Cal.3d 557, 577 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], original italics.)
 

 Here, the evidence showed that appellants knew the provisions of the injunction, and had come to Vallejo specifically to do what the enjoined parties could not. It did not show, however, appellants’ membership in, or affiliation with, any enjoined organization or person; it did not show a connection between Operation Rescue, or any of the groups that sponsored appellants’ journey to Vallejo, and any enjoined organization or person; and it did not show that appellants were playing the “shell games” with which the court was properly concerned. (Cf.
 
 Roe
 
 v.
 
 Operation Rescue, supra,
 
 54 F.3d at pp. 139-140.) Instead, it showed a single interaction between appellants and an enjoined party, Ross’s motioning to Reece to leave the vicinity of the demonstration. This, we conclude, is too insubstantial, in the light of the whole record, to support the conclusion that appellants acted “in concert” with Reece. We, therefore, reverse appellants’ convictions.
 

 Phelan, P. J., and Corrigan, J., concurred.
 

 [1]
 

 Our Supreme Court has upheld this injunction (see
 
 Planned Parenthood Shasta-Diablo, Inc.
 
 v.
 
 Williams
 
 (1995) 10 Cal.4th 1009 [43 Cal.Rptr.2d 88, 898 P.2d 402]
 
 (Williams II)),
 
 and the United States Supreme Court has denied certiorari (see
 
 Williams
 
 v.
 
 Planned Parenthood Shasta-Diablo, Inc.
 
 (1997) _ U.S. _ [117 S.Ct. 1285, 137 L.Ed.2d 360]).
 

 [2]
 

 It was later amended in ways not relevant to this appeal.
 

 [3]
 

 See
 
 Planned Parenthood Shasta-Diablo, Inc.
 
 v.
 
 Williams
 
 (1994) 7 Cal.4th 860 [30 Cal.Rptr.2d 629, 873 P.2d 1224]
 
 (Williams I).
 
 The United States Supreme Court later vacated the judgment in
 
 Williams I
 
 and remanded the matter for reconsideration in light of
 
 Madsen
 
 v.
 
 *901
 

 Women’s Health Center, Inc.
 
 (1994) 512 U.S. 753 [114 S.Ct. 2516, 129 L.Ed.2d 593]
 
 (Madsen).
 
 (See
 
 Williams
 
 v.
 
 Planned Parenthood Shasta-Diablo, Inc.
 
 (1994) 513 U.S. 956 [115 S.Ct. 413, 130 L.Ed.2d 329].) On remand, in
 
 Williams II,
 
 our Supreme Court reaffirmed the judgment of the Court of Appeal, upholding the injunction.
 

 [4]
 

 The text of the flyer reads as follows: “Summer of Missions activities to ignore injunctions that violate first ammendment [sic] rights. Vallejo ruling won’t affect planned activties [sic]. [1] This summer pro-life activists plan to travel up and down the California Coast in a national event called the Summer of Missions. The Summer of Missions is a four week combined vacation and pro-life event. This summer vacation is sponsored by Operation Rescue National, Operation Rescue of California, California Missionaries to the Pre-bom, and Youth for America National.
 

 “Injunctions that violate first amendment rights to free speech and freedom of assembly will simply be ignored. No one will
 
 unknowingly
 
 violate any injunction or law (the Freedom of Access to Clinic Entrances law). Everyone who does, will understand that they are violating an injunction or law.
 

 “Planned events include No Place To Hide Campaigns (protesting at doctors’ homes and offices), protests, prayer vigils, and other forms of protest protected by the First Amendment.”
 

 [5]
 

 This is not to say that injunctions are punitive. “The historic injunctive process was designed to deter, not to punish.”
 
 (Rondeau
 
 v.
 
 Mosinee Paper Corp.
 
 (1975) 422 U.S. 49, 61 [95 S.Ct. 2069, 2077, 45 L.Ed.2d 12].)
 

 [6]
 

 Otherwise, our Supreme Court could not have declared the injunction content-neutral, as it did in
 
 Williams II.
 
 (See 10 Cal.4th at p. 1019.)