Filed 5/25/22  In re R.H. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.H. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E078019 |
| Plaintiff and Respondent, | (Super. Ct. Nos. J288815 & J288816) |
| v. | OPINION |
| C.R., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Affirmed.

John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

# I.

## INTRODUCTION

C.R. (Mother) is the mother of 11-year-old S.H. and three-year-old R.H.  Mother appeals from the juvenile court's dispositional order removing the children from her custody (Welf. & Inst. Code,[1] § 361, subd. (c)(1)).  Mother contends that there was insufficient evidence to support the juvenile court's order removing the children from her custody, the court misapplied the burden of proof, and there were reasonable means available to protect the children without removing them from her custody.[2]  We disagree and affirm the juvenile court's order.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the San Bernardino County Children and Family Services (CFS) in December 2020 due to the mothers ongoing and contentious custody dispute over the children in family law proceedings.[3]  At that time, CFS provided the mothers with referrals for counseling to address the relationship concerns and their inability to coparent.

---

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] Mother A.H. (A.H.) is not a party to this appeal.

[3] Mother and A.H. were in a registered domestic partnership under Family Code section 297.

2

In February 2021, the family law court temporarily granted primary legal and physical custody of S.H. to A.H., and primary legal and physical custody of R.H. to Mother. Mother was granted visitation with S.H. on alternate weekends while A.H. was granted alternate weekend visits with R.H. Mother and A.H. were ordered to communicate by means of Talking Parents.

In March 2021, CFS received six different referrals with allegations of physical and emotional abuse of S.H. by A.H. The referrals noted that A.H. had poked S.H. with her long fingernails, grabbed him by the hoodie, threw him in the back seat of the car where she left him locked and unattended for 30 minutes, elbowed S.H. in the face causing a bloody nose, and locked S.H. in a bedroom for prolonged periods of time causing him to urinate on himself. The referrals also indicated that S.H. had been placed on involuntary section 5150 holds in December 2020 and March 2021 after he had expressed suicidal ideations. The sixth referral alleged general neglect to S.H. by A.H. after the child refused to return to A.H.'s custody during the custody exchange. When S.H. was interviewed, he appeared traumatized, exhibited behavioral outbursts, and reported physical abuse in both homes. S.H. also disclosed being "coached" in both homes.

On March 31, 2021, a social worker held an informal meeting with both mothers to address the concerns of emotional abuse to the children, to promote effective communication between the mothers, and to discuss a third party arrangement for custody exchanges. CFS's attempts to work with the mothers, however, was to no avail,

3

and by April 2021, the custody exchanges had not improved. Mother had violated family law orders multiple times by refusing to exchange the children with A.H. She had also transferred S.H.'s medical card to a county where he did not reside, thereby preventing A.H. from getting him mental health services. The social worker believed Mother's conduct negatively impacted S.H.'s behaviors and emotional state. Mother and A.H. also had prior child welfare histories. A.H.'s eldest child was removed from her care and her parental rights as to that child were terminated in 2008.

Despite A.H.'s prior child welfare history, the social worker believed that A.H. was a safer and more protective parent at the time and obtained a warrant to detain the children from Mother while maintaining them with A.H. The social worker noted that A.H. was cooperative with CFS, enrolled S.H. in programs to address his behaviors and mental health, and attempted to change the child's medical coverage to the county of residence. Mother, on the other hand, repeatedly violated prior family law court orders, made excessive calls to CFS and law enforcement with allegations of child abuse in A.H.'s home, and undermined effective coparenting efforts.

On April 8, 2021, CFS filed petitions on behalf of the children pursuant to section 300, subdivisions (b) (failure to protect), (c) (emotional abuse), and (j) (abuse of a sibling). The petitions were later amended on June 14, 2021, to add domestic violence allegations against both mothers.

The children were formally detained from Mother at the April 9, 2021 detention hearing, and maintained with A.H. on the condition that no corporal punishment be used

4

on the children.  Mother was provided with weekly supervised visits, and both mothers were advised against making disparaging remarks to the children.

CFS recommended that the petitions be sustained, the children be maintained with A.H. under a family maintenance plan, and that Mother be provided with reunification services.  A.H. denied physically or emotionally abusing the children.  A.H. believed the allegations stemmed from Mother's false reports to CFS and law enforcement in order to gain primary custody of the children.  A.H. also believed that Mother suffered from an undiagnosed mental health disorder which impaired her ability to provide adequate care and protection to the children.  A.H. noted that she had observed Mother's extreme mood swings and anger.  A.H. also reported several incidents of domestic violence during her domestic partnership with Mother, including a 2008 incident in which Mother hit and choked A.H., resulting in Mother's arrest.[4]  A.H. recalled another incident in November 2020 in which Mother hit her in the face while she (A.H.) was holding R.H.  S.H. intervened during this incident by pulling Mother away.  A.H. believed the children suffered serious emotional damage due to the custody battle between her and Mother.

Mother denied any untreated mental health issues or difficulties regulating her emotions.  She also denied she was in a registered domestic partnership with A.H. or that

---

[4] Mother's criminal history indicated that she had domestic violence charges in 2006 for infliction of corporal injury to a spouse or cohabitant and a 2008 charge for battery on a spouse.

A.H. was named as a parent on the children's birth certificates.[5] She further denied that the children suffered emotional abuse as a result of the custody dispute between her and A.H. Mother claimed that A.H. used excessive physical discipline on the children and was the cause of S.H.'s emotional issues. Mother acknowledged she had previously been arrested for domestic violence.

On April 29, 2021, the children's attorney requested the children be removed from A.H.'s care based on S.H.'s disclosures of physical abuse in the home. The court granted the request, detained the children from A.H.'s care, placed them in a foster home, and offered the mothers pre-disposition services.

By June 2021, S.H. continued to exhibit emotional issues and was placed on a psychiatric hold for stabilization following his visit with A.H. on June 5. During the visit, S.H. refused to participate in the visit with A.H. and was asked to sit separately so that A.H. could visit R.H. When S.H. overheard A.H. stating that she needed the iPad returned from S.H., S.H. had an emotional breakdown. He began to hit his head on the wall, throw toys, mix playdoh containers, and swing a small plastic golf club. Despite efforts to de-escalate the child, S.H. continued to slam himself against the wall and fall to the ground. After CFS transported the child to a hospital for an evaluation of the physical injuries he had sustained from slamming into the wall, S.H. was placed on a psychiatric hold and remained hospitalized until June 16, 2021. After A.H. recovered the iPad, it

---

[5] Both A.H. and Mother were named as the children's parents on the birth certificates.

6

was discovered that S.H. was having unauthorized and unsupervised contact with Mother. A.H. showed CFS text messages between S.H. and Mother, in which Mother tells S.H. to delete the text messages. The child also used the iPad to watch pornography and communicate with an unidentified individual about his wish to commit suicide.

CFS was also concerned about Mother's mental health as she was unable to regulate her emotions and behaviors. In addition, she continued to deny responsibility for her actions and did not believe her behavior affected the children. In regard to the pre-disposition services, Mother had begun individual counseling. However, her therapist reported that Mother was not taking any responsibility for the case, required extensive services, and requested additional sessions in advance. CFS was concerned that S.H.'s disclosures were influenced by "at least one parent." CFS noted that while S.H. maintained A.H. physically abused him, he also had a pattern of disclosing abuse while changing some details and recanting the allegations. In any event, CFS believed S.H.'s emotional and mental state required protection and recommended reunification services for A.H. and Mother. CFS noted that Mother would benefit from a psychological evaluation in order to identify untreated mental health issues and to determine the appropriate treatment.

On June 22, 2021, CFS applied for psychotropic medication on S.H.'s behalf for "acute stabilization." Clinical observations described S.H. as "impulsive, aggressive towards self and other[s] including banging head into walls, punching other[s] and thr[owing] objects." Mother disagreed with the administration of medication explaining

7

that "[S.H.]'s behavior has changed because of [A.H.] . . . abusing him over and over in different ways and he's having a hard time being around her."

On August 3, 2021, the mothers participated in mediation. A.H. reached an agreement, but Mother continued to disagree with the allegations and disposition.

By August 18, 2021, Mother continued to engage in pre-disposition services and had completed individual counseling, parenting classes, and a domestic violence program. However, Mother's domestic violence service provider indicated that Mother's progress was "[g]uarded" as she required additional sessions to "complete the book, . . . a safety plan and a[n] exit letter." CFS was concerned that Mother had not benefitted from her services as she continued to fail to take responsibility for her role in the acts of domestic violence and demonstrated stalking conduct by appearing excessively early at visits in order to observe A.H. CFS thus recommended that Mother complete an additional domestic violence courses for perpetrators. Meanwhile, S.H.'s mental health had begun to stabilize.

The contested jurisdictional hearing was held on August 19, 2021. Mother testified, and denied having an untreated mental health condition or an inability to manage her emotions. She, however, was willing to undergo a psychological evaluation. She disagreed with the details of the November 2020 domestic violence incident, but acknowledged that she had been arrested as a result of the incident. She also denied that she almost hit A.H. with her car during a custody exchange. Mother admitted that she had kept S.H. from A.H. in violation of family law court orders, but explained it was

8

because S.H. had reported being abused in A.H.'s care. She also acknowledged that there were times when she did not allow S.H. to call A.H. Mother admitted that the relentless custody battle with A.H. had a negative impact on the children's emotional and mental state, but denied that she had coached the children. She believed S.H. showed no mental health decompensation or stress in her custody and that S.H.'s mental health had significantly improved since December 2020. Following testimony and argument from the parties, the juvenile court found true some of the allegations in the amended petitions as modified and dismissed some of the allegations. The court found both Mother and A.H. to be the children's presumed mothers and continued the matter for a contested disposition hearing.

On September 29, 2021, another application to continue S.H.'s psychotropic medication was filed. Although the child's mental health improved while he was in the group home, there was at least one incident when the child became aggressive with the roommate. He was also irritable at times, continued to fidget, and had difficulty following instructions. The prescribing psychiatrist believed that stopping medication would "mean decompensation and jeopardize placement." The court granted the application.

By October 13, 2021, Mother continued to participate in services, including parenting, individual counseling, and domestic violence. Mother also completed a psychological evaluation with Dr. Brodie. Dr. Brodie diagnosed Mother with "Partner Relational problem," and concluded that Mother would need to focus on "effective

9

coping with the relational stress, and managing her emotions and behaviors that may [be] triggered if she continues to co-parent with [A.H.]." Dr. Brodie noted that Mother would benefit from "Dialectical Behavior Therapy (emotion regulation and distress tolerance)." Dr. Brodie also explained that Mother demonstrated "a passive style of communication," which made her "more prone to aggressive reactions in her romantic relationships," served "as a barrier to her setting limits with her son in order to comply with court orders," and resulted in "an avoidant response pattern and failure to verbalize responsibility for her actions." Dr. Brodie recommended "individual therapy to build assertive communication" in conjunction with "treatment focused on assertive communication and interpersonal effectiveness skills" to address Mother's difficulties with self-reflection and acknowledgement of responsibility. Dr. Brodie noted no specific mental health issues that would prevent Mother from benefitting with services. However, Dr. Brodie stated that continued domestic violence between Mother and A.H. would present a risk to the children's safety. Dr. Brodie thus recommended specific risks and consequences of domestic violence and ongoing domestic dispute be identified for Mother in writing. Dr. Brodie further noted that Mother would also benefit from additional coaching and parental support groups.

The contested dispositional hearing was held on October 29, 2021. At that time, Mother's counsel argued there was insufficient evidence to remove the children from her care and requested the court place the children back in her care under a family maintenance plan. The juvenile court denied the request, noting that although Mother

10

had received a positive psychological evaluation and there was no impediment for her ability to benefit from services, "[the court] [had] no information regarding [Mother] that she's accepting any responsibility for the true findings."[6] The court noted that therapy for Mother was still left on her case plan and "possible PCIT [Parent Child Interaction Therapy]." The court declared the children dependents of the court, removed them from parental custody, and provided the mothers with reunification services and supervised visits. Mother timely appealed.

III.

DISCUSSION

Mother contends the juvenile court erred by removing the children from her custody because the court misapplied and shifted the burden of proof and there was insufficient evidence to support the order.[7] She argues that because she had acknowledged the protective issues in this case and immediately participated and completed most of her pre-disposition services, removing the children from her custody was not necessary to protect the children's physical and emotional well-being. Mother

---

[6] The court specifically stated, "I'll note that as to family maintenance, the Court does not have information before it that the true findings have been addressed. ¶ I'm happy to see that there is a positive psychological evaluation. For the court's purpose what that tells me is that there's no cognitive or mental health reason as to why Mom can't benefit from services but to date I have no information regarding [Mother] that she's accepted any responsibility for the true findings."

[7] Mother does not challenge the juvenile court's jurisdictional findings.

11

also asserts that there were reasonable means to protect the children without removing them from her care.

"After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing. [Citation.] At the dispositional hearing, the court must decide where the child will live while under the court's supervision." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.)

"A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . . [¶] (1) [That] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . custody." (§ 361, subd. (c)(1).) "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 695.) "The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion." (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103-1104.)

"Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 76.) California law therefore

"requires that there be no lesser alternative before a child may be removed from the home of his or her parent." (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 284; § 361, subd. (c)(1).) But, "'"[t]he parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.]'" (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.) At the dispositional stage, the court may consider a parent's past conduct, present circumstances, and response to the conditions giving rise to the dependency proceedings. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

We review a juvenile court's dispositional order removing a child from parental custody for substantial evidence, "'bearing in mind the heightened burden of proof.'" (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.) "Substantial evidence is evidence that is reasonable in nature, credible, and of solid value. We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. We draw all legitimate and reasonable inferences in support of the judgment. The appellant has the burden to demonstrate there is no evidence of a sufficiently substantial nature to support the findings or orders. [Citation.]" (*In re D.B.* (2018) 26 Cal.App.5th 320, 328-329.)

A. *Misapplication of the Burden of Proof*

Relying on portions of the juvenile court's comments, namely that it had "'no information . . . that she's accepted any responsibility for the true findings,'" Mother initially asserts the court's ruling shows "a misapplication of the burden of proof." We disagree. The court's statements as to failing to accept responsibility and failing to

13

address the jurisdictional true findings do not support Mother's contention that the court shifted the burden of proof to the parent or that it misapplied the burden of proof. Rather, when viewed in its context and in its entirety, the court was merely explaining, based on Dr. Brodie's conclusions, why the children should be removed from Mother's custody, namely because Mother still had not addressed all of the issues leading to the dependency case. "A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163 [focus of the statute is on averting harm to the child].

Mother's argument presumes the juvenile court applied the wrong standard. But as a reviewing court, we are required to presume the opposite. (See *Ross v. Superior Court* (1977) 19 Cal.3d 899, 913 ["'in the absence of any contrary evidence, we are entitled to presume that the trial court . . . properly followed established law'"].) Where the legal standard to be applied is clear, we presume the juvenile court applied the proper standard. (*In re Fred J.* (1979) 89 Cal.App.3d 168, 175.) Moreover, it appears this preliminary argument by Mother is essentially an effort to establish that the removal order is not supported by sufficient evidence, which we address below.

B. *Substantial Evidence to Support Removal Order*

Substantial evidence in this case shows that removing the children from Mother's custody was necessary to protect the children's physical, developmental, and emotional well-being, and there were no other reasonable means by which the children's well-being

14

could be protected without removing them from Mother's custody. (§ 361, subd. (c)(1).) The record reveals that Mother suffered from relationship issues with A.H. that impacted her ability to provide appropriate care and support for the children and that her animosity toward A.H. was causing S.H. emotional distress. Despite having completed most of her pre-disposition services, Mother continued to minimize her role in this case, failed to take responsibility for her actions, and blamed A.H. for S.H.'s mental health issues. She dismissed the domestic violence issues between her and A.H. and had a limited understanding of the impact domestic violence had on the children's well-being. Mother's actions and statements showed that she had limited insight into the cycles of violence or interpersonal conflict resolution. In fact, despite having received over six months of services, the issues leading to the children's initial detention (domestic violence and emotional abuse to the children) had not been resolved. As a result, Dr. Brodie recommended that specific risks and consequences of domestic violence and ongoing domestic disputes be identified for Mother in writing. "A parent's denial of domestic violence increases the risk of it recurring." (*In re V.L.* (2020) 54 Cal.App.5th 147, 156; *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].)

Mother asserts that by the contested dispositional hearing, she had been separated from A.H. "for nearly a full year" and had no plans to reconcile. However, both mothers were still going through the dissolution proceedings in family law court and would continue to coparent and share custody of the children in the future. Without a clear

15

understanding of the issue and how it impacts the children, physical separation would not preclude further incidents of domestic violence or the children's exposure to emotional trauma as a result of the her partner relationship problems with A.H.

Moreover, Mother's inability to regulate conflict and emotions led to the children suffering from emotional and behavioral issues, especially S.H. S.H. had exhibited, and continued to exhibit, severe behavioral and emotional problems, such as throwing objects, grabbing knives, hitting walls, and threatening to commit suicide. At least one of S.H.'s mental health hospitalizations occurred as a result of Mother's refusal to allow S.H. telephone contact with A.H. during her custodial time. Nonetheless, Mother continued to blame A.H. for S.H.'s emotional problems. The record is clear that Mother had not accepted any responsibility for her role in the reasons for CFS's involvement, including decompensation of S.H.'s mental health. Mother's therapist thus requested extensive services for Mother with additional sessions of individual counseling. Dr. Brodie also opined that Mother needed to focus on "effective coping with the relational stress, and managing her emotions and behaviors that may [be] triggered if she continues to co-parent with [A.H.]." Due to Mother experiencing difficulties with self-reflection and acknowledgement of responsibility, Dr. Brodie thus recommended further therapy for Mother.

Despite these concerns and substantial evidence in the record to the contrary, by the time of the October 2021 dispositional hearing, Mother continued to minimize any concerns regarding her ability to safely care for the children and provide for their well-

16

being. She failed to take any responsibility in her actions giving rise to the dependency proceedings. Without acknowledgement of her relationship issues and ability to regulate conflict and emotions, there was or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children if they were returned to Mother's care.

We observe that R.H. was only two years old when he came to the attention of CFS. S.H. was 10 years old but suffered from mental and behavioral issues due to the contentious relationship between Mother and A.H. At these ages and mental and behavioral concerns, the children remained completely reliant on a caregiver for their health, safety, and protection. Accordingly, that caregiver would need to be independently familiar with identifying the needs of a toddler and a child with special needs and would need to protect the toddler and child. Mother had, to date, not met those requirements as she had not taken responsibility for the reasons why her children were removed from her care and continued to minimize her actions and role leading to the children's detention. This is particularly concerning and a high-risk case, given the tender age of R.H. and the special needs of S.H.

Furthermore, contrary to Mother's claims, there were no reasonable means available to protect the children short of removal. She asserts that given her "cooperation and participation in services in the months leading up to disposition and the availability of additional safety measures (such as unannounced social worker visits) afforded by juvenile court jurisdiction, reasonable means short of removal were available in this

17

case." We disagree. CFS *did* attempt to develop a safety plan with Mother and A.H. for approximately five months prior to the children's detention. CFS first observed the family in December 2020, and at that time, provided the mothers with referrals for counseling to address their relationship concerns and inability to coparent. And, on March 31, 2021, after six referrals alleging emotional and physical abuse, CFS held a meeting with the mothers to address concerns related to the children's emotional abuse and ways to promote effective communication between the mothers.

The social worker had explained to both mothers that S.H.'s autism spectrum required more balanced parenting. Nonetheless, the mothers continued to have relationship issues that often involved law enforcement and CFS interventions, causing S.H. to suffer further mental and behavioral issues. Even by April 2021, the custody exchanges between the mothers had not improved. Mother refused to return the children to A.H. in accordance with the court-approved custody order and A.H. accused Mother of "screaming and yelling" during exchanges. Despite the mothers receiving voluntary services while the children were in their custody, the children's safety was still at risk. Further, Mother demonstrated that she was unwilling or unable to comply with court orders without close supervision. She repeatedly violated family law court custody exchange orders, and during the dependency proceedings, violated court orders by engaging in unauthorized and unsupervised contact with S.H.

Moreover, despite receiving six months of services, Mother continued to minimize her actions, failed to take responsibility for some of her actions, and blamed A.H. for the

18

dependency proceeding.  She also failed to show that she could regulate conflict and emotions in order to protect the children.  Given these concerns, the juvenile court reasonably concluded that the only way to ensure the children's safety was to remove them from Mother's custody.  There were no reasonable means to protect the children short of removal from Mother.

Mother has not met her burden on appeal to demonstrate that there is no substantial evidence to support the juvenile court's dispositional order removing the children from parental custody.

IV.

DISPOSITION

The juvenile court's dispositional order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON_____
Acting P. J.

We concur:

SLOUGH_____
J.

FIELDS_____
J.

19